530

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name ___ **Amaro** ___ **Miguel** _____
           (Last)           (First)           (Initial)

3    Prisoner Number ___ C-88580 _____

4    Institutional Address ___ Correctional Training Facility

5    _____ P.O. Box 689, Soledad, CA 93960 _____

6    ====================================================

7    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF CALIFORNIA

8    MIGUEL AMARO,                              )
     (Enter the full name of plaintiff in this action.)   )
9                                               )
                    vs.                         )    Case No. _____ 2338
10                                              )    (To be provided by the clerk of court)
     BEN CURY (Warden),                         )
11                                              )    **PETITION FOR A WRIT**
     _____           )    **OF HABEAS CORPUS**
12                                              )
     _____           )
13                                              )
     _____           )
14   (Enter the full name of respondent(s) or jailor in this action)   )
15                                              )

16   ====================================================
                    **Read Comments Carefully Before Filling In**

17   **When and Where to File**

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located.  If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined.  Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS

·· 1   Who to Name as Respondent

2          You must name the person in whose actual custody you are. This usually means the Warden or

3   jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents.

6          If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11         1. What sentence are you challenging in this petition?

12             (a)     Name and location of court that imposed sentence (for example; Alameda

13                     County Superior Court, Oakland):

14  **Los Angeles County Superior Court    Los Angeles**

15                     Court                              Location

16             (b)     Case number, if known __**A-903202**__

17             (c)     Date and terms of sentence __**6/27/1984 – 15 years to life**__

18             (d)     Are you now in custody serving this term? (Custody means being in jail, on

19                     parole or probation, etc.)            Yes __**x**__    No _____

20                     Where?

21                     Name of Institution: **Correctional Training Facility**

22                     Address: **P.O. Box 689, Soledad, CA 93960**

23         2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  **Second degree murder / kidnap - 187 / 207**

27  **(convicted of the murder under the felony murder rule)**

28  _____

PET. FOR WRIT OF HAB. CORPUS         - 1 -

1    3.  Did you have any of the following?

2          Arraignment:                              Yes _____     No _____

3          Preliminary Hearing:                      Yes _____     No _____

4          Motion to Suppress:                       Yes _____     No _____

5    4.  How did you plead?

6          Guilty _____   Not Guilty _____   Nolo Contendere _____

7          Any other plea (specify) _____

8    5.  If you went to trial, what kind of trial did you have?

9          Jury _____   Judge alone_____   Judge alone on a transcript _____

10   6.  Did you testify at your trial?                 Yes _____     No _____

11   7.  Did you have an attorney at the following proceedings:

12          (a)    Arraignment                       Yes _____     No _____

13          (b)    Preliminary hearing               Yes _____     No _____

14          (c)    Time of plea                      Yes _____     No _____

15          (d)    Trial                             Yes _____     No _____

16          (e)    Sentencing                        Yes _____     No _____

17          (f)    Appeal                            Yes _____     No _____

18          (g)    Other post-conviction proceeding  Yes _____     No _____

19   8.  Did you appeal your conviction?               Yes _____     No _____

20          (a)    If you did, to what court(s) did you appeal?

21                 Court of Appeal                   Yes _____     No _____

22                 Year: _____   Result: _____

23                 Supreme Court of California       Yes _____     No _____

24                 Year: _____   Result: _____

25                 Any other court                   Yes _____     No _____

26                 Year: _____   Result: _____

27

28          (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS          - 2 -

On February 14, 2007, Petitioner had a subsequent parole
suitability hearing (EXHIBIT 1, parole hearing transcript), resulting
in a split decision which was referred to an "en banc" for review.
On March 20, 2007, without comment, the Board, by a unanimous vote,
voted for unsuitability (EXHIBIT 2). Petitioner was not notified
of the en banc hearing and therefore was unable to present evidence
to the en banc panel.

The Board has Petitioner's life term commencing "on or about
July 3, 1984 (EXHIBIT 1, HT 1),[1] with a minimum eligible parole
date of December 5, 1992.[2] Petitioner was convicted of one count
of second degree murder in violation of Penal Code § 187,[3] and two
counts of kidnap in violation of Penal Code § 207. All sentences
were ran concurrent and Petitioner was sentenced to an indeterminate
term of 15 years to life pursuant to Penal Code § 190. By all
accounts, Petitioner was not the "trigger man"; but rather, a passive
participant who, at gun point, did what he was told.

## The Commitment Offense

There are two versions of the offense, the official version
read into the record at HT 16:11 through HT 19:6, and Petitioner's
version, which was read into the record at HT 19:8 through 22:4.
The two versions differ little, Petitioner's version coalescing with

1. References to parole hearing transcript will be noted by HT followed
by page number when necessary, e.g., (HT 1:1).

2. Being sentenced under Penal Code § 190, the offense having been committed
prior to 1/1/83, Petitioner's credit earning statute is § 2931; thus he
has a "liberty interest" in his conduct credits to reduce the term.

3. All statutes and regulations are California, unless otherwise noted.

the official version, filling in blanks. In short: On December 5,
1982 Eric Collier, Russell Walker, James Tokumoto, were visiting
a residence that Petitioner shared with Daniel Almarez and Robert
Almarez. Petitioner was temporarily staying with the Almarez brothers
while he looked for a permanent residence and had stayed with the
brothers only a few days prior to the instant offense. Petitioner
was with his girlfriend that day. When Petitioner returned to the
Almarez residence he was asked to sample some cocaine, which he did,
then remained drinking beer and eating pizza.

Eric Collier, Russell and James Tokumoto arrived at the
residence. Daniel Almarez learned from Tokumoto that Tokumoto was
responsible for Almarez' girlfriend moving out and a shouting match
ensued that developed into a fight. Almarez pistol whipped Tokumoto,
and when Sagmeister saw the gun in Daniel Almarez' hand he took it
away. The table then turned and Tokumoto was getting the best of
Danial Almarez. Daniel Almarez called out to his brother Robert
Almarez for help. Robert Almarez shot and killed James Tokumoto.

Daniel Almarez told Sagmeister to close the drapes and clean
up the blood. Then at gunpiont Petitioner was ordered to assist
in taping the hands of Collier and Walker. Daniel Almarez gave
Petitioner some keys and told him to get the car. Collier and Walker
were then driven, with Petitioner driving, to an isolated spot.
Once out of the car Walker was able to free his hands and escape.
Walker was able to call the police and when responding found Robert
Almarez and took him into custody.

Daniel Almarez ordered Petitioner to drive out of the area.
Petitioner eventually stopped the car, and when Daniel Almarez took

- 7 -



Collier out of the car Petitioner tried to persuade Almarez to let Collier go. Almarez refused to listen to Petitioner's protestations, shooting Collier three times. Collier's body was taken and dumped at another location, and upon returning to the Almarez residence Daniel Almarez had Petitioner help him remove the body of Tokumoto and dump it near Gardenia.

Petitioner has consistently maintained, and the official offense summary supports his contention, that "at no time was he a willing participant in the subsequent kidnapping and shootings. [Petitioner] stated that he was threatened at gunpoint by Daniel Almarez if he did not cooperate...and was quite fearful that he himself might be killed since he was aware that Almarez was heavily involved in gang activity and could be extremely violent[,]" as certainly evidenced by the instant offense.

Petitioner was under the influence of drugs and alcohol at the time of the offense and believes it had an impact on his judgment and behavior (EXHIBIT 3, p. 2).

## Pre-Commitment Factors

Petitioner was asked about a prior arrest in 1971 (HT 22). Petitioner explained that he was at a party in a park when a fight broke out and the police arrived. Petitioner did not minimize his involvement, stating: "I got in a fight with one of the officers and eventually as a result of it I knocked his teeth out with a brick and I was arrested" (HT 22:18-25). Petitioner was 19 years old.

Petitioner came from a broken home that was "unstable and chaotic"; being "estranged from his father at an early age," his father being "unloving and uncaring" and always compared Petitioner

- 8 -

to his older brother (HT 24:20-25:1).

Petitioner started using marijuana at age 12, became rebellious, and left home at age 14. Petitioner entered the United States Army in 1971, but was honorably discharged after two months when a physical abnormality was discovered (HT 25:2-10). Petitioner was gainfully employed his adult life as a welder, until, Petitioner was visiting his father and step-mother when the couple got into an argument, his father following his step-mother into the bedroom, and hearing two gunshots went to the bedroom, discovering his step-mother shot to death and his father shot himself in the head, dying en route to the hospital (HT 60:5-27). Petitioner did not get counseling after this traumatic experience (HT 61:1-4), but retreated to "using drugs much more heavily" and his relataionship with his girlfriend dissolved (HT 26:6-8). Petitioner does have an extensive preconviction history of alcohol and drug abuse (EXHIBIT 3, p. 2).

## Post-Commitment Factors

Relating to Petitioner's prior drug use, he "believes his incarceration to be a 'blessing in disguise" (EXHIBIT 3, p. 2), having participated actively in AA/NA since May of 1988 "and shown an ability to understand and comprehend all aspects of the 12-step program through his own self-improvement techniques" (HT 38:2-10). Additionally, Petitioner has participated in the Prison Industry Authority Inmate Employability Program and anger management, "understanding anger and controlling your emotions" (HT 40:13-25).

Highly unusual, three different Correctional Officers submitted laudatory chronos supporting Petitioner's suitability for parole: C/O Salazar (HT 41:7-27); C/O Eucina (HT 42:1-43:16); and C/O Sterling

(HT 43:19-44:23). These are correctional professionals who, with a collective of over 50 years experience, have daily real life contact and observation with Petitioner, and are in accord -- Petitioner is no longer the individual he was a quarter century ago and has learned to overcome adversity and disappointment in one of the most dehumanizing and violent environments known to man: prison life.

Commissioner Kubochi quizzes Petitioner about Dr. Howlin's 2003 psychological evaluation, noting that Petitioner was intoxicated at the time of the commitment offense, and that a return to substance use "could be said to be a possible precursor to violence. Should this individual choose to abuse substances again, his violence potential would be considered much higher than the average citizen in the community" (HT 51:12-52:3). Commissioner Kubochi then asks Petitioner to get into the mind of Dr. Howlin, requesting Petitioner "to tell the Panel why did the doctor say this about you that if you took substances, anything that affected your mind, and I'm going to include prescription drugs..." (HT 52:5-12). Petitioner certainly cannot get into the mind of Dr. Howlin, but tried to explain that perhaps because of his past history of substance abuse, resulting in the commitment offense (HT 52:13-17). Commissioner Kubochi then becomes adversarial with Petitioner, badgering him (HT 52:18-56:9), and it becomes apparent no answer Petitioner gives will satisfy Commissioner Kubochi.

Petitioner pointedly explained how working the 12-steps has changed his life and helps him to deal with adversity and leaving his old lifestyle behind, telling the Board about his upbringing, using drugs the people he ran around with, the lifestyle, and his

- 10 -

father being very abusive when Petitioner was a child (HT 58:4-21). All of this, Petitioner's whole life experience, made up who he was at the time of the instant offense. Petitioner's sister has helped Petitioner search many Alcoholics Anonymous groups in the area where he will parole as he realizes recovery is an ongoing process and he will therefore "be an ongoing participant in alcoholics anonymous" (HT 49:18-50:10).

When asked how Petitioner has changed, he answered: even at age 30 he was "a very immature, irresponsible person. [] I didn't know about the [re]sources that I can go to if a problem comes my way. I didn't know how to deal with it" (HT 62:11-16). Conversely, Petitioner explained that during his incarceration he "was afforded all the different programs that I participated in and again, I'm not that same person anymore. [] I've become more mature, responsible, and I understand and gained a lot of insight of the crime" (HT 62:17-26). Commissioner Kubochi commented: "I think you have. And I do believe you've made a strong change in the direction of your life" (HT 63:1-2). Petitioner stated: "I didn't have no character back then. I sit here as of today ad in the midst of adversity I don't care what it is I'm not doing something that's wrong anymore" (HT 65:6-11).

## Psychological Evaluations

The current psychological evaluation (EXHIBIT 3) was prepared by Dr. Marek, one of the Board's recently hired forensic experts. Deputy Commissioner Melvin covers the forensic evidence. It is Dr. Marek's expert opinion that, reading at HT 33:4-24), directly from Dr. Marek's evaluation (EXHIBIT 3, p. 3): If released to the

- 11 -

community, his violence potential is considered to be about the same as the average citizen in the community. All things considered, his pre-incarceration record is not that severe. With the gains he has made here, he should be able to generalize those gains to the community." Of course, and Petitioner realizes it will always be, thus he must be forever vigilant: "Significant risk factors and precursors to violence for him would be a return to drug/alcohol use and return to an irresponsible lifestyle."

Petitioner's counsel added to the record, reading directly from Dr. Marek's evaluation (HT 34:3-35:6; EXHIBIT 3, p. 3), in short: Petitioner "exhibited no psychotic or depressive symptomatology. [] He has good insight and judgment especially as they relate to his crime"; and pp. 3-4: Petitioner "is competent and responsible for his behavior. He has the capacity to abide by institutional rules and has generally done so during his incarceration. He does not have a mental health disorder that would necessitate treatment either during his incarceration or on parole." Of course, drug/alcohol testing was seen as mandatory. Dr. Marek concluded, "Parole decisions should be based on custody factors."

## Closing Statements

The Los Angeles County Sheriff's Department sent a letter opposing parole based on the commitment offense (HT 72:9-75:11); and the Los Angeles County District Attorney Office opposed parole via Deputy District Attorney Bushling (HT 75:15-76:22), believing Petitioner had to answer more questions about insight into what made him feel the kind of rage that caused him to commit the instant offense. The deputy district attorney seemingly forgets that

- 12 -



Petitioner was not the shooter, participated at gunpoint, and Daniel Almarez shot Collier over the protestations of Petitioner.

Counsel for Petitioner, relying on the appellate transcripts on appeal, pointed out: (1) it is undisputed that Petitioner was not the one who pulled the trigger (HT 77:1-2); (2) Robert and Daniel Almares were the perpetrators in this crime (HT 77:5-7); (3) Petitioner was an unwilling participant and convicted under the felony murder rule (HT 77:7-10); (4) Sagmeister testified that Petitioner looked terrified, supporting Petitioner's previous testimony by Petitioner that he was fearful of Daniel Almarez (HT 77:10-18); (5) to his own detriment with no expectations of leniency Petitioner testified against the Almarez' (HT 77:20-24; (6) Petitioner had no predisposition to commit the offense but was induced by others to participate (HT 78:1-3); (7) Petitioner was a passive participant, which no one disputes (HT 78: 4-6); and (8), Petitioner was under the influence of drug/alcohol which clouded his judgment (HT 78:20-23).

Counsel went on to point out that the offense is never going to change and Petitioner's suitability deserves "individual consideration" (HT 79:8-10). Petitioner is not a current threat to public safety in that in 25 years of incarceration he has not had a single incident of violence (HT 79:13-17), and has participated in significant self-help over the years (HT 79:18-20). Petitioner has the extremely rare support of correctional staff being supportive of parole (HT 80:4-6). Additionally, psychological evaluations by forensic experts going back at least to 2000 all support parole concluding Petitioner's risk assessment is no greater than the average

- 13 -

citizen in the community (HT 80:7-13). Petitioner has solid parole plans with community support with relapse prevention in place (HT 80:14-25).

Petitioner closed with a statement of the changes in his life and commitment to sobriety, and how the split decision in 2004 motivated him to strive forward, "to grow more spiritually and emotionally" (HT 82:6-12). Petitioner reiterated that he had solid parole plans with residence and guaranteed employment upon release (HT 82:23-27). Petitioner has an AA sponsor and several locations for participation in AA, providing addresses and phone numbers (HT 83:24-84:11).

## D E C I S I O N

This was a "split decision" that required an en banc hearing (Penal Code §§ 3041(d) and 3041.5. Presented here are the decisions of Commissioner Kubochi, finding Petitioner unsuitable for parole, and Deputy Commissioner Melvin finding Petitioner suitable for parole. It is a question of which of the two is the better reasoned decision.

Commissioner Kubochi concluded Petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison" (HT 88:22-24) based on the following, reiterating the facts of the offense (HT 89:1-90:3):

(1) The Commitment Offense: "this offense was carried out in an especially cruel and callous manner" (HT 88:25-27); after explaining the "justification for the killing the sheriff indicates it was a drug transaction gone bad. There is other information that Mr. Tokumoto had some contact with Mr. Alvarez' girlfriend that caused Mr. Alvarez to have ill feelings" stated "the motive for the crime was inexplicable and very trivial in relationship to the loss of two lives" (HT 89:3-11); "The way that the crime was carried out shows a dispassionate, calculated manner in that it was almost execution style" (HT 89:11-14); all of which is true of the offense itself, but not of Petitioner's individual offense behavior.

- 14 -

(2) Prior conduct, Petitioner's "escalating pattern of criminal conduct starting off with hitting a peace officer with a brick" (HT 90:3-7). Commissioner Kubochi rationalized "that in each instance your explanation was to blame other people or blame circumstances that were totally out of your control..." (HT 90:7-14).

(3) Having not sufficiently participated in beneficial self-help, again, Commissioner Kubochi relied on the manner in which the crime was carried out "in which you had hostile feelings or uncontrollable feelings regarding your participation in those crimes. And you need a little more therapy" (HT 90:14-26).

(4) Prior drug use, Commissioner Kubochi stated that if Petitioner were to "ingest mind altering substances" his "risk of violence is very high. Simply telling the Board that you will refrain from alcohol does not address the underlying issues that appear to be your problem, and it is a finding that you could benefit from further therapy before being released back into society" (HT 91:10-17). And

(5) Opposition from the Los Angeles County District Attorney and Los Angeles County Sheriff's Department (HT 91: 5-9).

Deputy Commissioner Melvin, after reviewing "all of the

information received from the public" concluded Petitioner "is

suitable for parole and would not pose an unreasonable risk of danger

to society or a threat to public safety if released from prison"

(HT 91:20-26). The decision was based on the following factors

(HT 91:26-94:19):

(1) No juvenile record of assaulting others.

(2) Petitioner "has a stable social history as exhibited by reasonably stable relationships with others. In particular, Mr. Amaro, you've mentioned that you keep in contact with your brothers..." (HT 92:1-11).

(3) Petitioner has enhanced his ability to function within the law upon release through participation in educational programs, close to getting AA degree, participation in AA, NA and anger management.

(4) Petitioner received certification in welding, obtained a fork lift operators license, and training in commercial laundry and dry cleaning.

(5) Prior to the life crime, Petitioner lacked a significant criminal history of violent crimes.

-- 15 --

(6)   Because of maturation, growth, great understanding and/or
      advanced age, Petitioner has reduced probability of recidivism.

(7)   Petitioner's current forensic evaluation by Dr. Marek indicates
      that Petitioner's judgment has become clear and he has matured,
      and if released to the community violence potential is no greater
      than the average citizen in the community and can generalize
      gains in the community.

(8)   Petitioner's 2000 forensic evaluation by Dr. Tout was supportive
      of parole, stating his prognosis for maintaining his present
      gains in the community to be excellent as long as he continues
      to abstain from substance use.

(9)   "I will read into the record a 2000 report from Dr. Koch wherein
      he indicates that if released to the community his violence
      potential is estimated to be no higher than the average citizen
      in the community" (HT 93:22-26).

(10) Petitioner "has realistic parole plans which include a job
     offer and/or family support...various letters from various family
     members indicating his close family ties" (HT 94:1-8).

(11) Petitioner has "maintained positive institutional behavior
     which indicates significant improvement in self-control"
     (HT 94:9-11).

And (12), Petitioner "shows signs of remorse...indicat[ing] that
he understands the nature and magnitude of the offense and
accepts responsibility for the criminal behavior and has a desire
to change towards good citizenship" (HT 94:11-15).

Deputy Commissioner Melvin then calculated Petitioner's term,

basing the term of second degree murder in accord with California

Code of Regulations, Title 15, § 2403(III-B), stating "there was

no prior relation with the victim and that death was almost immediate"

(HT 95:10-19). The term was aggravated based on Petitioner having

"the clear opportunity to cease but continued. The manner in which

the crime was committed created a potential for serious injury to

persons other than the victims of the crime which would be the young

man that ran away" (HT 95:19-96:1). Additionally, the "murder was

committed to prevent discovery of another crime. There were multiple

victims for which the term is not being enhanced under Section

-- 16 --

2407...two counts of kidnapping and for that reason I'm adding a total of 84 months to the base term and my calculation was that because a weapon was used an additional year should be added to that (Petitioner did not use nor was he enhanced with a gun allegation) and my total was 325 months" (HT 96:1-11). Petitioner was given 76 months postconviction credits, resulting in a net term of 249 months total period of confinement (HT 96:11-13).

Special conditions were placed on Petitioner to participate in AA or NA and sustain from the use or possession of alcohol and submit to narcotics testing (HT 96:14-19).

## DECISION OF SUPERIOR COURT

On October 2, 2007 (served October 12, 2007), the Honorable Peter Espinoza, Judge, Superior Court of Los Angeles County, denied Petitioner's writ of habeas corpus challenging the Board's decision to deny Petitioner parole (EXHIBIT 4).

The facts recited by the trial court (EXHIBIT 4, p. 1), are accurate in describing the commitment offense, but ignores the critical fact of Petitioner's individual offense behavior; that is, according to trial testimony by Jeff Sagmeister, who was granted immunity and had no reason to lie, testified that Petitiner acted out of fear of the Almarez brothers (EXHIBIT 1, HT 77:10-18), Petitioner acting out of duress, not entirely of his own free will, and to his own detriment, testified against his own interest to the actions of the Alamrez brothers (HT 77:20-24).

The trial court found that there was "some evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner. Cal. Code Regs., tit. 15,

- **17 -**

§2402, subd. (c)(1)(B)" (EXHIBIT 4, p. 2).

While the trial court correctly stated that "Petitioner participated in nearly every facet of the crime except the killing itself" (EXHIBIT 4, p. 2), and while it may be true "the offense for the crime was very trivial in relation to the offense" (Id.), the trial court, like Commissioner Kubochi's decision, was not (1) based on Petitioner's individual offense behavior, being ordered what to do at gunpoint; nor (2) in light of Petitioner's rehabilitation, was there a rational connection made between the commitment offense 25 years ago and Petitioner's CURRENT threat to public safety when Petitioner was convicted of second degree murder under the felony murder rule and he has served the minimum term in calendar years for first degree murder.

On November 20, 2007, Petitioner filed his habeas corpus in the California Court of Appeals, Second Appellate District, Division Four; summarily denied February 21, 2008, opining: "There is 'some evidence' to support the findings of the Board of Parole Hearings. (See In re Dannenberg (2005) 34 Cal.4th 1061, 1071.)" (EXHIBIT 5).

On or about February 28, 2008, Petitioner filed his Petition for Review in the California Supreme Court; being summarily denied April 28, 2008, with Justice Moreno of the opinion the petition should be granted (EXHIBIT 6).

* * * * * * *

If any of these grounds was not previously presented in any other court, state briefly which grounds were not presented and why:

All grounds were presented in state court.

- 18 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4        **PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO**

5    _____

6    _____

7    Do you have an attorney for this petition?              Yes_____    No_X___

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _____        _____

14              Date                Miguel Amaro
                                   Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS       - 19 -

## M E M O R A N D U M   O F   L A W

### A.  Liberty Interest in Parole

California Penal Code § 3041 gives indeterminately sentenced prisoners in California a liberty interest in parole (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Greenholtz), 442 U.S. 1 (1979); Sass v. California Board of Prison Terms (hereafter Sass) 461 F.3d 1123 (9th Cir. 2006); In re Rosenkrantz, 29 Cal.4th 616 (2002)).

### B.  Twenty-Five Years After The Predicate Act, There Is No Evidence Petitioner Is A CURRENT Threat To Public Safety.

Articulated by the United States Supreme Court: "The decision turns on...primarily what a man is and what he may become rather than simply what he has done" (Greenholtz, 442 U.S., at 10, supra). Thus, REHABILITATION is the Greenholtz doctrine.  If there is no evidence a prisoner is a CURRENT threat to the public, he or she is to be paroled (In re Rosenkrantz, 29 Cal.4th, at 655, supra; In re Sturm, 11 Cal.3d 258, 266 (1974) [the ultimate question is "whether the inmate will be able to live in society without committing additional antisocial acts"]).

Currently, the controlling authority on some evidence of what, is In re Singler, ___ Cal.App.4th ___, 2008 Cal. App. LEXIS 408 (2008), and in the Ninth Circuit is Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008), both of which relied on the same state court decisions to reach the same conclusion, except, in the case of Singler, the Singler court, the Third Appellate Disrrict, reached its conclusion after remand from the California Supreme Court with instructions (see In re Singler, 2008 Cal. App. LEXIS 408, *5-6, supra).  The Third Appellate District, as instructed by our Supreme Court, relied

- 20 -

on In re Elkins, 144 Cal.App.4th 475, 496-498 (2006); In re Lee,
143 Cal.App.4th 1400, 1400, 1408 (2006); In re Scott II, 133
Cal.App.4th 573, 594-595 (2005) (In re Singler, 2008 Cal. App. LEXIS
408, *6, supra). It is these same state appellate court cases that
the Ninth Circuit relied on in Hayward v. Marshall, 512 F.3d, at
543, supra. See Ryman v. Sears and Robuck, 505 F.3d 993, 995 (9th Cir.
2007) ["where there is no convincing evidence that the state supreme
court would decide differently, a federal court is obligated to follow
the decisions of the state's intermediate appellate courts."]

Analyzing California's parole law, reviewing federal
constitutional protections of the "some evidence" standard under
the application of California law, the Ninth Circuit Court of Appeals
concluded the suitability and unsuitability factors set out in Cal.
Code Regs., tit. 15, § 2402(c) and (d):

"Even though these suitability and unsuitability factors are helpful
in analyzing whether a prisoner should be granted parole, California
courts have made it clear that the 'findings that are necessary
to deem a prisoner unsuitable for parole,' Irons [v. Carey], 505
F.3d [846], at 850 [(9th Cir. 2007)], are not that a particular
factor or factors indicating unsuitability exists, but that
a prisoner's release will unreasonably endanger public safety.
(Citations); see Cal. Penal Code § 3041(b).... For our purposes,
then, '[t]he test is not whether some evidence supports the reasons
the Governor cited for denying parole, but whether some evidence
indicates a parolee's release endangers public safety."

The Third Appellate District echoed the Ninth Circuit in the
precedent setting decision of In re Singler, 2008 Cal. App. LEXIS
408, *38-39, supra: time and rehabilitation; In re Roderick, 154
Cal.App.4th 242, 264 (2007); In re Tripp, 150 Cal.App.4th 306, 309
(2007) ["the viciousness of the commitment offense must be balanced
against the passage of time and rehabilitation"]).

Like the Board, the state court misapplied the some evidence

- 21 -

standard, relying on immutable factors rather than the passage of
time, in this case 25 years, and Petitioner's "current" threat to
public safety.  The regulations that govern the Board's, and
Governor's, parole suitability decisions explicitly instruct that
an unsuitability decision is a conclusion "that the Board not schedule
the release (of) any life-maximum prisoner who is still dangerous"
(In re Dannenberg, 34 Cal.4th, at 1088, supra).  The operative word
is "still."  There is zero evidence Petitioner is "still dangerous."

C.  Petitioner's Individual Offense Behavior In The Instant
    Offense Was Not "Particularly Egregious."

        Although Petitioner may not be entitled to receive parole, he
is, nonetheless, entitled to have his consideration for parole "'duly
considered' based upon an individualized consideration of all relevant
factors" (In re Rosenkrantz, 2 Cal.4th, at 655, supra).

        The felony murder rule fictitiously imputes to one person the
intent of another.  It cannot be doubted that under the doctrine
of vicarious liability Petitioner is guilty of second degree murder.
However, while "[a]ny participant in a conspiracy may be equally
culpable as a matter of law.  The parole inquiry into the offense
severity is more factual, however, and focuses on the 'actual offense
behavior of the individual prisoner" (Roberts v. Corrothers, 812
F.2d 1173, 1180 (9th Cir. 1987); Cal. Code Regs., tit. 15, §
2402(c)(1) ["The prisoner committed the crime in an especially
heinous, atrocious, or cruel manner"] emphasis added).  The doctrine
of "vicarious liability" must be individually applied on a
case-by-case basis, because "guilt is based on a combination of the
direct perpetrator's acts and the aider and abettor's own acts and
own mental state" (In re Curtis Lee, Slip Copy, 2007 WL 3122523,

- 22 -

*4 (Cal.App. 1 Dist, 2007); quoting People v. McCoy, 25 Cal.4th 1111, 1117 (2001)).  See also People v. Sandoval, 41 Cal.4th 825, 843 (2007) ["although the crime involved great violence on the part of others, that violence did not evidence a 'high degree of cruelty, viciousness, or callousness' [] **on defendant's part**"], emphasis in original).

The murder for which Petitioner was convicted occurred during the commission of a kidnap.  It is undisputed that Petitioner was not an active participant and was forced at gunpoint to do what he was told, even at one point tried to convince Daniel Almarez not to shoot Eric Collier.  No one has ever disputed the foregoing facts. Petitioner's guilt lies in not going to authorities as soon as he was able, but rather said nothing to no one.  It is, nonetheless, cogent Petitioner's involvement was under duress and not entirely of his own free will; and, to his own detriment, testified against his own interest to the actions of the Almarez brothers.  Petitioner, being convicted under the felony murder rule, was convicted on less than the minimum elements of the commitment offense, absent any finding of malice (People v. Dillon, 34 Cal.3d 441 (1983); In re Elkins, 144 Cal.App.4th, at 497 fn. 9, supra).

## C O N C L U S I O N

It is respectfully requested that the Court ORDER the respondent to show cause why the writ should not be granted and the Board's en banc decision of March 20, 2007 should not be vacated and the decision of Deputy Commissioner Melvin adopted.

DATED: May 4, 08

Respectfully submitted,

Miguel Amaro
Petitioner in pro se

- 23 -

E X H I B I T  1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number C-88580
                          )
MIGUEL AMARO              )
                          )
                          )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 14, 2007

10:27 a.m.

**PENDING REVIEW AND APPROVAL**

PANEL PRESENT:

Stan Kubochi, Presiding Commissioner
Marjorie Melvin, Deputy Commissioner

OTHERS PRESENT:

Miguel Amaro, Inmate
Mark Norton, Attorney for Inmate
Brian Bushling, District Attorney's Office

CORRECTIONS TO THE DECISION HAVE BEEN MADE

                    No.    See Review of Hearing
                    Yes    Transcript Memoranda

**Jo Anne Jackson**
**Northern California Court Reporters**

INDEX

Page

Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Case Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Pre-Commitment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Post-Commitment Factors . . . . . . . . . . . . . . . . . . . 39

Parole Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Closing Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Recess . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Decision . .

Adjournment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Transcriber Certification . . . . . . . . . . . . . . . . . . . . . . . . 92

1          P R O C E E D I N G S

2          **PRESIDING COMMISSIONER KUBOCHI:** Good

3  morning, Mr. Amaro.

4          **INMATE AMARO:** Good morning.

5          **PRESIDING COMMISSIONER KUBOCHI:** How are

6  you?

7          **INMATE AMARO:** Fine, thank you.

8          **PRESIDING COMMISSIONER KUBOCHI:** Good

9  Before proceeding, Mr. Norton, are there any

10  interpreter issues?

11          **ATTORNEY NORTON:** No.

12          **PRESIDING COMMISSIONER KUBOCHI:** Thank

13  you. This is a subsequent parole consideration

14  hearing for Miguel Amaro, A-M-A-R-O, CDC number

15  C88580. Today's date is February 14, 2007. The

16  time is approximately 10:27 a.m. We are located

17  at the Correctional Training Facility. The

18  acronym for that facility is CTF, Soledad,

19  California. The inmate was received on or about

20  July 3, 1984 from Los Angeles County. His life

21  term began on or about July 3, 1984. The eligible

22  eligible parole date noted in the Board is, it

23  was 12, 1991. The controlling offense for which

24  the inmate has been committed is from Docket

25  A-903202 count two, violation of Penal Code

26  Section 187, murder in the second degree. There

27  were also convictions for count four and five

1   alleging a violation of Penal Code Section 207,

2   kidnap. The murder  ouht  involved the deceased,

3   Eric Collier, C-O-L-L-I-E-R. The victims alleged

4   in the kidnap were Aaron Collier, C-O-L-L-I-E-R

5   and Russell Walker, W-A-L-K-E-R.  For the

6   convictions listed in the court's Men of Order.

7   Mr. Amaro received a term of 15 years to life

8   with the kidnap counts four and five to run

9   concurrent.  This hearing is being tape recorded.

10  Mr. Amaro, and for the purposes of voice

11  identification each of us will be required to

12  state our names, spell our last names and when it

13  comes to your turn, please indicate your CDC

14  number, and we will go from left around the

15  table.  My name is Stan Kubochi, K-U-B-O-C-h-I,

16  Commissioner.

17      **DEPUTY COMMISSIONER MELVIN:** My name is

18  Marjorie Melvin, M-E-L-V-I-N, Deputy

19  Commissioner.

20      **DEPUTY DISTRICT ATTORNEY BUSHLING:** Brian

21  Bushling, B-U-S-H-L-I-N-G, representing the LA

22  County DA's office.

23      **ATTORNEY NORTON:** Mark Norton,

24  N-O-R-T-O-N, attorney for Mr. Miguel Amaro.

25      **INMATE AMARO:** Miguel Amaro, C88580

26      **PRESIDING COMMISSIONER KUBOCHI:** And could

27  you spell your last name?

1          **INMATE AMARO:**  A-M-A-R-O.

2          **PRESIDING COMMISSIONER KUBOCHI**  Thank

3  you, Mr. Amaro.  Are you comfortable?

4          **INMATE AMARO:**  I'm alert.

5          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

6  That's understandable.  And I want you to know

7  that this is a subsequent hearing.  As you are

8  aware this is not an adversarial proceeding even

9  though there's two commissioners, we're not here

10  to gang up on you.  We're here to make sure that

11  you have a hearing and that you believe that you

12  will be able to effectively communicate

13  throughout the proceedings.  Before we begin, you

14  will be required to read aloud the ADA rights and

15  self-identification statement that's before you.

16  Could you please read that into the record and do

17  it at your own pace and slowly, thank you.

18          **INMATE AMARO:**  "ADA, Americans

19          with Disabilities Act.  The

20          American's with Disabilities

21          Act, ADA is a law to help people

22          with disabilities.  Disabilities

23          are problems that make it harder

24          for some people to see, hear

25          breathe, talk, walk, learn,

26          think, work or take care of

27          themselves, than it is for .

4

1        others.  Nobody can be kept out
2        of public places or activities
3        because of a disability.  If you
4        have a disability, you have the
5        right to ask for help to get
6        ready for your BPT hearing, get
7        to the hearing, talk, read forms
8        and papers and understand the
9        hearing process.  The BPT will
10       look at what you ask for to make
11       sure that you have a disability
12       that is covered by the ADA and
13       that you have asked for the
14       right kind of help.  If you do
15       not get help or if you don't
16       think you got the kind of help
17       you need, ask for a BPT 1074
18       grievance form.  You can also
19       get help to fill it out."

20       **PRESIDING COMMISSIONER KUBOCHI:** Thank

21  you, Mr. Amaro.  Do you understand the Americans

22  with Disabilities Act and how it applies to this

23  proceeding.

24       **INMATE AMARO.** Yes, sir.

25       **PRESIDING COMMISSIONER KUBOCHI:** And I

26  note that it appears that on or about November 2,

27  2005, a correctional counselor reviewed a BPT

5

1   form 1073 with you and that you indicated no

2   disabilities and that your reading level at a

3   is that correct?

4          **INMATE AMARO:**   Yes.

5          **PRESIDING COMMISSIONER KUBOCHI:**   And that

6   you have a GED degree?

7          **INMATE AMARO:**   Yes, sir.

8          **PRESIDING COMMISSIONER KUBOCHI:**   Thank

9   you.   And that you signed and dated it November

10  2, 2005 with a check mark, I do not need any help

11  for my parole hearing; is that correct?

12         **INMATE AMARO:**   Correct.

13         **PRESIDING COMMISSIONER KUBOCHI:**   And I

14  take it that you are now wearing reading glasses?

15         **INMATE AMARO:**   Yes, sir.

16         **PRESIDING COMMISSIONER KUBOCHI:**   And might

17  I digress one moment with your permission.

18  There's two officers in the room but they're not

19  participating, they're here for security purposes

20  only.

21         **INMATE AMARO:**   I understand.

22         **PRESIDING COMMISSIONER KUBOCHI:**   And you

23  wear glasses?

24         **INMATE AMARO:**   Yes, sir.

25         **PRESIDING COMMISSIONER KUBOCHI:**   And are

26  they for reading?

27         **INMATE AMARO:**   Reading.

6

1      **PRESIDING COMMISSIONER KUBOCHI:** And do

2  you believe that they will be good enough

3  enough to look at any documents during this

4  proceeding if necessary?

5      **INMATE AMARO:** Yes, sir.

6      **PRESIDING COMMISSIONER KUBOCHI:** I take it

7  that you don't have any problems walking from

8  your living area to this room?

9      **INMATE AMARO:** No.

10     **PRESIDING COMMISSIONER KUBOCHI:** Do you

11 have any hearing problems?

12     **INMATE AMARO:** A little.

13     **PRESIDING COMMISSIONER KUBOCHI:** And when

14 you say a little, could you describe them in your

15 own words first of all, and second of all,

16 whether or not you will be able to hear well

17 enough to proceed with today's hearing?

18     **INMATE AMARO:** I can hear you clearly.

19     **PRESIDING COMMISSIONER KUBOCHI:** Thank you

20 very much.

21     **INMATE AMARO:** But if somebody's talking

22 low, I have a hard time hearing.

23     **PRESIDING COMMISSIONER KUBOCHI:**

24 Because this is a subsequent hearing, you are

25 aware that we reviewed various aspects about the

26 case as well as your progress here in the

27 institution.  And I want you to know that it

1  Commissioner Melvin or I say any fact about you

2  that you need into to you don't the ...

3  but wait because the transcriber can't do

4  voiceovers.  So you'll be afforded any

5  opportunity to make corrections, but please wait

6  so that two people are not speaking at the same

7  time.

8          **INMATE AMARO:**  Okay.

9          **PRESIDING COMMISSIONER KUBOCHI:**  And your

10  counsel will also have the opportunity to make

11  any corrections.

12         **INMATE AMARO·**  Okay

13         **PRESIDING COMMISSIONER KUBOCHI:**  I take it

14  that you believe that based on everything we've

15  discussed you will be able to communicate

16  effectively with this Panel today?

17         **INMATE AMARO:**  Yes, sir.

18         **PRESIDING COMMISSIONER KUBOCHI:**  Thank

19  you.  Counsel, do you have any ADA issues that

20  you wish to raise at this time other than the

21  hearing issue that the Panel has discussed with

22  Mr. Amaro?

23         **ATTORNEY NORTON.**  No, there are no the

24  issues.

25         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

26  One final area, Mr. Amaro, have you ever taken

27  any antipsychotic medications in the institution

6

1          **INMATE AMARO**·  No. sir.

2          **PRESIDING COMMISSIONER KUBOCHI**

3    taking any medication that would affect your

4    thought processes today?

5          **INMATE AMARO:**  No, sir.

6          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you

7    very much.  This hearing is being conducted

8    pursuant to the Penal Code and the rules and

9    regulations of the Board of Parole Hearings

10   governing parole consideration for life inmates

11   The purpose of today's hearing is to once again

12   consider your suitability for parole  In doing

13   so we will consider the number and nature of the

14   crimes for which you were committed, your prior

15   criminal and social history, your behavior and

16   programming since your commitment and your plans

17   if released.  We've had the opportunity to review

18   your Central file and you will be given that

19   opportunity as previously discussed to make any

20   corrections or additions as you deem appropriate

21   and necessary.  We will consider your progress

22   since your commitment, your counselling report

23   your mental health evaluation, the number of

24   your progress and any reports since our last

25   hearing and any change in parole plans brought to

26   our attention.  We will reach a decision today

27   and inform you whether or not we find you.

1  suitable for parole and the reasons for our

2  decision. If you are not suitable for parole

3  the length of your confinement will be explained

4  to you. Before we recess for deliberations, the

5  district attorney's representative, Mr. Bushling,

6  your attorney, any member of the public, any

7  member of the victim's family and you will be

8  given an opportunity to make a final statement to

9  the Panel. Your statement will be limited as to

10  why you feel you are suitable for parole. We

11  will then recess, we will deliberate and we will

12  reach a decision that will be announced to you.

13  The California Code of Regulation states that

14  regardless of the time served by you, a life

15  inmate shall be considered unsuitable for parole

16  and denied parole if in the judgment of the Panel

17  the inmate would pose an unreasonable danger to

18  society if released from prison. Now, Mr. Amaro,

19  you do have certain rights in regards to today's

20  proceedings. Those rights include the right to a

21  timely notice of this hearing, the right to

22  review your central file and the right to present

23  relevant documents. Now not to belabor any

24  further, Mr. Amaro, do you have any other

25  documents today that you wish to present to the

26  Panel for it's consideration that we have not

27  received by means of your Central file?

1          **INMATE AMARO**  Ye:  ...

2          **PRESIDING COMMISSIONER KUBOCHI**

3   could you show them to your counsel?

4          **ATTORNEY NORTON:**  Well they're all -

5          **PRESIDING COMMISSIONER KUBOCHI:**  Well,

6   you'll be given an opportunity - let's have your

7   attorney discuss that with you.

8          **ATTORNEY NORTON:**  What do I have here?

9   Everything that I have in here in this file, you

10  will be given a copy of each.

11         **PRESIDING COMMISSIONER KUBOCHI:**  Oh right.

12  you were going to give a copy to each one of us

13         **ATTORNEY NORTON:**  Yes   He has four copies

14  of material that he would like to be have

15  considered, one for you, one for the deputy

16  commissioner, and everything's in order.  It's a

17  chrono (inaudible).  He's gone to great lengths

18  to put this together

19         **PRESIDING COMMISSIONER KUBOCHI**   M:

20  Amaro, I assure you that before we reach the

21  decision and during deliberations, the Pa.

22  review everything that you have and why

23  take a moment. counsel, to you in regard

24  now rather than doing that at a later time since

25  it's when Mr. Amaro wishes to address the Panel?

26         **ATTORNEY NORTON:**  Okay.  Well, as he said

27  and he did indicate to me that this is a

ii

1    goes through basically his parole plans as well

2    as previous and again, mark  I  this stuff a

3    included in the Central File  but I think he put

4    this together just so that for convenience sake.

5            **PRESIDING COMMISSIONER KUBOCHI:**  No, I

6    understand. Mr. Amaro, as I've indicated you have

7    our assurance that we will take the time to read

8    all of that material.

9            **ATTORNEY NORTON:**  Great.  Thank you.

10           **PRESIDING COMMISSIONER KUBOCHI**  And I do

11   have one question, Mr. Amaro. have you given that

12   to your correctional counselor to file in the

13   Central File?

14           **INMATE AMARO:**  Yes, sir.

15           **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

16   Counsel, Mr. Norton, you received the Board

17   report?

18           **ATTORNEY NORTON·**  Correct.

19           **PRESIDING COMMISSIONER KUBOCHI:**  Did it

20   appear to you that some of the material that he

21   wishes to present today has been placed in the

22   Central File?  The only reason I'm saying that

23   Mr  Amaro, is that after considering  the

24   documents we will return them to you so that you

25   can work with the correctional counselor to make

26   sure that everything is in the Central File.

27   Okay.  In other words  if we took it we would go

1  back through our other assignments and we

2  wouldn't know whether she or not or not or not

3  the Central File and I say that to not disregard

4  all of the effort that you put in these exhibits.

5          **INMATE AMARO:** I understand.

6          **PRESIDING COMMISSIONER KUBOCHI:** Okay.

7  Thank you.

8          **ATTORNEY NORTON:** So would you like me to

9  submit those --

10         **PRESIDING COMMISSIONER KUBOCHI:** Yes.

11 We're doing it now because we will --

12         **ATTORNEY NORTON:** Thank you very much.

13         **PRESIDING COMMISSIONER KUBOCHI:** read

14 them during deliberations. I just wanted to be

15 sure that we're on the same page and at the same

16 (inaudible) right between Commissioner Melvin and

17 I. Mr. Amaro, you also have an additional right

18 to be heard by an impartial panel. Do you have

19 any objection to the Panel that's currently

20 constituted?

21         **INMATE AMARO:** No, sir.

22         **PRESIDING COMMISSIONER KUBOCHI:** Thank

23 you. You will receive a copy of our written

24 decision today. That decision becomes final

25 within 120 days. A copy of the decision and a

26 copy of the transcript will be sent to you.

27 Recently, Mr. Amaro, there have been changes in

1    the regulations in regard to your right of

2    appeal. I would have any questions from

3    regard to issues of appeal to your attorney for

4    his response. And the Panel is not going to try

5    to explain that because of the recent changes.

6    You are not required to admit or discuss your

7    offense. However, this Panel does accept as true

8    the findings of the Court. Do you understand

9    that?

10              **INMATE AMARO**: Yes, sir

11              **PRESIDING COMMISSIONER KUBOCHI**: That is

12   we're not here to relitigate your (inaudible)

13   Commissioner Melvin, is there any confidential

14   material to be used in today's proceeding?

15              **DEPUTY COMMISSIONER MELVIN**: There is not.

16              **PRESIDING COMMISSIONER KUBOCHI**: Thank you

17   very much. Now, I passed the hearing checklist

18   marked Exhibit A to Mr. Norton and the district

19   attorney representative Mr. Bushling, and we did

20   so to make sure that everybody has the same set

21   of facts to this hearing other than the CDC

22   material you presented and they have reviewed it

23   and it's now placed back in the (inaudible) report

24   file.

25              **ATTORNEY NORTON**: Commissioner if I may, I

26   believe these are brand new chronos. I do not

27   have my Board packet that Mr. Amaro's provided to

14

1   me this morning  I would like to also submit

2   those in connection with the testimony

3   discussion.

4           **PRESIDING COMMISSIONER KUBOCHI**:  What

5   we'll do is keep them now.

6           **ATTORNEY NORTON**:  Okay.

7           **PRESIDING COMMISSIONER KUBOCHI**:  And what

8   we'll do is we'll consider that addendum to the

9   record that you have, you feel free to read into

10  the record –

11          **ATTORNEY NORTON**:  Okay

12          **PRESIDING COMMISSIONER KUBOCHI**:   -- for

13  consideration purposes, submit them before we go

14  in to recess and we will consider that.

15          **ATTORNEY NORTON**.  And would you like me to

16  do that during our discussion of post-conviction

17  factors?

18          **PRESIDING COMMISSIONER KUBOCHI**:  When it's

19  the appropriate time for you to respond.

20          **ATTORNEY NORTON**:  Okay.  Thank you

21          **PRESIDING COMMISSIONER KUBOCHI**  Well, Mr.

22  Amaro, would you be speaking about the offense

23  that resulted in the life crime today during

24  these proceedings.

25          **INMATE AMARO**:  I prefer not to for reasons

26  I spoke to about the crime at numerous areas with

27  my counselor in the psychs every year.  It's

15

1  become a flautdiller. However if the Panel has
2  any specific areas any questions or any
3  problem with that.

4       **PRESIDING COMMISSIONER KUBOCHI**:  I
5  understand what you're saying and so what we'll
6  do is just for the record I will have to recite
7  the facts taken from the Board report in to the
8  record and factors that relate to your progress
9  while incarcerated as well as your parole plans
10  will be discussed.  If they interweave with the
11  life crime, you and your attorney can decide
12  whether or not you want to address it and the
13  Board does have requirement where it's compelled
14  to ask questions to satisfy it's concern
15  concerning your suitability --

16       **INMATE AMARO**:  I understand.

17       **PRESIDING COMMISSIONER KUBOCHI**:  And the
18  issue of whether or not you would pose a danger
19  to the public if released but you will have the
20  right to discuss your response with your attorney
21  before doing so

22       **INMATE AMARO**:  I understand

23       **PRESIDING COMMISSIONER KUBOCHI**
24  other statement I would like to put you under
25  oath for any other statement that you give to
26  this Board by raising your right hand.  Do you
27  solemnly swear or affirm that the statements that

1   ... give at this hearing will be the tiour, the

2   whose train and not ... ... ... ... ...

3       **INMATE AMARO:**   I do.

4       **PRESIDING COMMISSIONER KUBOCHI:**   thank you

5   very much.  I've indicated to counsel that for

6   purposes of the underlying facts of the life

7   commitment, I will read into the record from the

8   Board report dated July 2003, and that was

9   submitted by correctional counselor Ratrud

10  (phonetic).

11          "On December 5, 1982 at

12          approximately 9:45 p.m. victim

13          Eric Collier along with Russell

14          Walker and James Tokumoto,

15          T-O-K-O-M-U-T-O, were visiting

16          with Daniel Almarez,

17          A-L-M-A-R-E-Z, Robert Almarez,

18          Jeff Sagmeister,

19          S-A-G-M-E-I-S-T-E-R, and the

20          inmate Miguel Amaro in an

21          apartment located at 1 4 7 1 4

22          Chadron, C-H-A-D-R-O-N, Avenue in

23          Lennox, L-E-U-N-O-X. Tokumoto and

24          Daniel Almarez were in the kitchen

25          talking when the fight started.

26          Daniel Almarez produced a gun

27          which he struck Tokumoto several

1        times in the head. Sagmeister saw

2        the gun but under ... and took

3        it away. The fight resumed and

4        Daniel Almarez called to Robert

5        Almarez for help. Robert shot and

6        killed James Tokumoto. Daniel

7        told Sagmeister to close the

8        drapes and clean up the blood. At

9        gunpoint Daniel then taped the

10       mouths and hands of the victims

11       Russell Walker and Aaron Collier

12       and took their wallets. Miguel

13       Amaro assisted in taping up

14       Collier. Daniel told Amaro to get

15       some rope. Amaro left and

16       returned with a white bag. Daniel

17       gave Amaro some keys and told him

18       to get the car. The two victims

19       Walker and Collier with their

20       hands tied was taken to a

21       (inaudible) by Daniel and Robert

22       Almarez. Amaro was the driver of

23       the vehicle. Amaro eventually

24       stopped the car on Marine Avenue

25       in Manhattan Beach. Robert

26       Almarez, the victims Walker and

27       Collier got out of the vehicle

42

1    Walker was able to free himself
2    and attempted to escape threw Collier
3    back into the van and told Robert
4    to go after Walker.  While running
5    from his captors, Walker could
6    hear two gunshots.  Walker was
7    able to hide and then at one of
8    the residences in the area call
9    the police.  The police arrived,
10   observed Robert Almarez, recovered
11   the gun and took Almarez into
12   custody.  Meanwhile, Daniel told
13   Amaro to go look for Robert and he
14   drove down two streets.  Daniel
15   told Amaro to drive out of the
16   area and eventually had him stop
17   the car.  Daniel took Collier out
18   to a grassy area.  Amaro told
19   Daniel to let Collier go but after
20   hesitating Daniel said, 'Fuck
21   no,' grabbed Collier, shot him
22   three times.  Amaro and Daniel
23   Almarez drove the victim Collier
24   from the area and early the
25   following morning Collier's body
26   was found in the 1900 block of El
27   Segundo (phonetic) Boulevard

19

1          Tokumoto had been shot in the head.

2          Amaro and killed Tokumoto. He

3          returned to the apartment and

4          carried Tokumoto's body into the

5          station wagon and dumped it at an

6          area near Gardenia."

7   Mr. Amaro's version.

8          "Mr. Amaro stated that he had

9          moved in with Daniel Almarez for

10         only a few days before the

11         homicide as he was looking for a

12         place to stay and had been

13         visiting with a girlfriend

14         throughout most of the day of the

15         homicide.  Danny asked him to

16         sample some cocaine which he

17         intended to purchase (inaudible),

18         and he sold the drug but didn't

19         use it (Amaro returned to the

20         residence and verified that the

21         drug was good.  Amaro remained at

22         Almarez residence drinking beer

23         and eating pizza with Danny and

24         his friends when he received a

25         telephone call from James

26         Tokumoto.  Tokumoto was invited to

27         join the group and did so along

1    with the other victim, Russell
2    Walker and victim, Jason
3    learned from Tokumoto that
4    Tokumoto was responsible for
5    Almarez' girlfriend moving out and
6    a shouting match ensued that
7    developed into a fight. The
8    incident proceeded as described in
9    the offense summary and Amaro
10   indicated that at no time was he a
11   willing participant in the
12   subsequent kidnapping, and
13   shootings. Amaro stated that he
14   was threatened by gunpoint by
15   Daniel Almarez if he did not
16   cooperate. Mr. Amaro indicated
17   that he unsuccessfully attempted
18   to convince Almarez to release
19   Walker and Collier during the
20   course of the kidnapping. He was
21   outside the immediate presence of
22   Almarez only once throughout the
23   incident and was quite fearful
24   that he himself might be killed
25   since he was aware that Almarez
26   was heavily involved in gang
27   activity and could be extremely

21

1        different.  The one time he was away

2        from the immediate presence of

3        Almarez was when he was ordered to

4        go outside and get the car.  Amaro

5        stated that in hindsight he

6        realizes he would have been able

7        to flee.  At this point the fear

8        for his own life kept him from

9        leaving.  After dropping off

10       Tokumoto's body, he was returning

11       with Almarez to the residence when

12       he was stopped by a peace officer

13       at a road block which was set up

14       He was taken into custody as a

15       result of having a six pack of

16       beer open on the front seat.

17       Almarez who was asleep in the back

18       seat was allowed to remain in the

19       vehicle.  Amaro was afraid to

20       discuss the matter with anyone and

21       since he had not been identified

22       at that point he was released on

23       his own recognizance the following

24       day.  He stayed with his

25       girlfriend for several days during

26       which he was drinking and using

27       drugs heavily.  He assumed that

46

1          eventually he would be arrested in

2          the matter and that he did not

3          he continued to maintain his

4          silence."

5    Mr. Amaro, in regard to your prior criminality

6    and your prior criminal record, was there - did

7    you have an arrest I think in 1971 about some

8    assault at a park you were at and you were put on

9    two years' probation?

10          **INMATE AMARO:** Yes, sir.

11          **PRESIDING COMMISSIONER KUBOCHI:** And what

12   city was that?

13          **INMATE AMARO·** Santa Clara County, San

14   Jose.

15          **PRESIDING COMMISSIONER KUBOCHI** And could

16   you briefly describe the facts surrounding your

17   arrest for that incident?

18          **INMATE AMARO·** Well, I was at a park and

19   there was like a party going on and a fight broke

20   out and I got involved and a few minutes later

21   law enforcements arrived. So got in to

22   altercation with the officers and I got in a

23   fight with one of the officers and as a result, as

24   a result of it I knocked his teeth out with a

25   brick and I was arrested.

26          **PRESIDING COMMISSIONER KUBOCHI:** Thank you

27   for providing that information. Counsel, is

1   looking through the central file I recall that I

2   obtained this information from the records of the

3   County probation report for the life crime and

4   specifically page six.

5          **ATTORNEY NORTON:**  Right, and I may have

6   misheard you commissioner, but I thought you said

7   1979, it was 1971.

8          **PRESIDING COMMISSIONER KUBOCHI:**  No, yeah,

9   I did.  I corrected myself.

10         **ATTORNEY NORTON:**  Okay.  Thank you.

11         **PRESIDING COMMISSIONER KUBOCHI:**  I have a

12  every now and then I'll say the wrong fact or

13  the wrong word but --

14         **ATTORNEY NORTON:**  I appreciate that.

15         **PRESIDING COMMISSIONER KUBOCHI:**  -- it you

16  bear with me I'll come back and put the right

17  date.  This was May 23, 1971.

18         **INMATE AMARO:**  Yes, it was.

19         **PRESIDING COMMISSIONER KUBOCHI:**  It

20  explained it just like in the probation report

21  just for clarification and my understanding who

22  would have been about 11 years before the

23  homicide case?

24         **INMATE AMARO:**  Yes.

25         **PRESIDING COMMISSIONER KUBOCHI:**  And I'm

26  not good with math, and how old were you in this

27  May 23, 1971 incident?

1 **INMATE AMARO:** Nineteen

2 **PRESIDING COMMISSIONER KUBOCHI:** Okay.
3 The probation report also indicates that in '91
4 you had a in your own terms DUI, 23102 was the
5 code section, and that's drunk driving, and I'm
6 only reading from the probation report. If I'm
7 wrong feel free to clarify the record. It says
8 that you admitted to being drunk and you pled
9 guilty to drunk, but I'm not saying that it was
10 for 23102 drunk driving. I'm just reading from
11 the probation report. Do you have any
12 recollection about it?

13 **INMATE AMARO:** No, sir.

14 **PRESIDING COMMISSIONER KUBOCHI:** No
15 problem. In regard to your personal history, Mr.
16 Amaro, for counsel I'm going to read from the
17 July 2003 report. It appears to have the best
18 rendition of Mr. Amaro's personal factors.

19 **INMATE AMARO:** Okay.

20 **PRESIDING COMMISSIONER KUBOCHI:** Miguel
21 Amaro was the son of Jose and Mary Amaro and was
22 the second of seven children. Amaro describes
23 his childhood as unstable and chaotic. He found
24 himself estranged from his father at an early
25 age. He talked of an unloving and uncaring
26 father who constantly made comparisons with his
27 older brother who was used as an active and

1   model which he did not live up to.  He began
2   experimenting with alcohol and marijuana at an
3   ... and had developed somewhat of a rebellious
4   nature thereafter.  He decided to leave home at
5   age 14.  Amaro was able to maintain an existence
6   in the San Jose area  by living off friends and
7   other family members.  He then entered the United
8   States Army in 1971 and was ultimately discharged
9   after two months receiving a medical release due
10  to a physical issue.  He migrated to the Los
11  Angeles area in 1971 and began employment at the
12  Bethlehem Steel Company, working in the
13  fabrication shop.  He was subsequently laid off
14  due to work unavailability and then became
15  involved in the construction business which
16  enabled him to qualify for the Iron Worker's
17  Union.  While he had no gang activity, he did
18  associate with others in the neighborhood with
19  similar lifestyle to his and eventually led to
20  his arrest and jail.  Later he moved to Los
21  Angeles.  He found a new girlfriend and
22  (inaudible) after his parent's divorce in that
23  he introduced his father to his girlfriend's
24  mother.  His father had helped him acquire a job
25  as a welder for the construction for the nuclear
26  power plant.  He described, 'We're not close.  We
27  would see each other after work and occasionally

1   share a bed  . His father married his
2   girlfriend's mother, however, their relationship
3   ended by Amaro finding his stepmother's body after
4   death at the hands of his father and his father
5   apparently had a self-inflicted gunshot would
6   which was failed.  His relationship with his
7   girlfriend dissolved then he began drinking and
8   ended up using drugs much more heavily.  Amaro
9   himself had begun to deal drugs to support
10  himself as well as supply his own habit.  Amaro
11  was laid off on the job, was forced to find
12  another place to live.  He moved in with Daniel
13  Almarez who was Amaro's former girlfriend's uncle
14  and Almarez was five years older then he.  These
15  activities and relationships culminated in the
16  life crime that occurred at the Almarez
17  residence.  Mr. Amaro, could you clarify how many
18  brothers and sisters you have.  It said seven
19  but I kind of wanted you to --

20          **INMATE AMARO:**  Well  three brothers and
21  then three sisters, seven including me.

22          **PRESIDING COMMISSIONER KUBOCHI**   And since
23  your incarceration here at CTF, have any of your
24  brothers or sisters visited you?

25          **INMATE AMARO:**  Yes, sir.

26          **PRESIDING COMMISSIONER KUBOCHI:**  Could you
27  please indicate just what your  wo brothers

1   three brothers. If possible (inaudible)

2           **INMATE AMARO**:  My brother Joseph.

3           **PRESIDING COMMISSIONER KUBOCHI**:  Then

4           **INMATE AMARO**:  -- my brother Robert.  My

5   other brother, he's deceased.

6           **PRESIDING COMMISSIONER KUBOCHI**:  Okay.

7           **INMATE AMARO**:  My sister Angie, and my

8   sister Maria.

9           **PRESIDING COMMISSIONER KUBOCHI**:  Angie and

10  Maria.

11          **INMATE AMARO**:  Excuse me, it's three

12  sisters.

13          **PRESIDING COMMISSIONER KUBOCHI**   No

14  problem.  That's what we're here for.  We want to

15  make sure the record is based on accurate facts.

16  You had nieces and nephews visit you here?

17          **INMATE AMARO**:  Yes.

18          **PRESIDING COMMISSIONER KUBOCHI**:  Please

19  list those.

20          **INMATE AMARO**:  My niece Lisa Castro, my

21  niece Amanda Gomez, my nephew Jessie Gomez and my

22  daughter Yolanda Chavez and her husband Felix

23  Chavez.

24          **PRESIDING COMMISSIONER KUBOCHI**.

25  Basically, we're trying to get a chronological

26  understanding, how often would your two brothers

27  Joseph or Robert visit you?

28

1        **INMATE AMARO:** About every other year

2  they reside in the same street.

3        **PRESIDING COMMISSIONER KUBOCHI:** Oh, is

4  that right? And how about your sisters Angie,

5  Maria or Theresa?

6        **INMATE AMARO:** Maria at least twice a

7  month. My sister Angie maybe once a year,

8  Theresa about once a year.

9        **PRESIDING COMMISSIONER KUBOCHI:** In

10  looking at your Central File you have resided

11  essentially before incarceration in two areas

12  the San Jose area and then in Los Angeles

13        **INMATE AMARO:** Yes, sir

14        **PRESIDING COMMISSIONER KUBOCHI:** Could you

15  clarify whether most of your relatives are in the

16  northern part of California or some of these

17  people that you refer to live in the southern

18  part of the state?

19        **INMATE AMARO:** The majority in northern

20  California.

21        **PRESIDING COMMISSIONER KUBOCHI:** Okay.

22  Are you currently married?

23        **INMATE AMARO:** No, ma'am, not currently

24        **PRESIDING COMMISSIONER KUBOCHI:** And could

25  you indicate your wife's name?

26        **INMATE AMARO:** Dianne (phonetic).

27        **PRESIDING COMMISSIONER KUBOCHI:** And a

1   you have any children with Diane?

2          **INMATE AMARO**   No, sir

3          **PRESIDING COMMISSIONER KUBOCHI**   And when
4   did you get married?

5          **INMATE AMARO:**   In '96.

6          **PRESIDING COMMISSIONER KUBOCHI:**   And does
7   the Board report accurately indicate that you had
8   one other significant relationship in which you
9   had I believe one child?

10          **INMATE AMARO:**   Yes, sir, that would be my
11   daughter Yolanda.

12          **PRESIDING COMMISSIONER KUBOCHI**   And was
13   that was before your incarceration?

14          **INMATE AMARO:**   Yes, sir.

15          **PRESIDING COMMISSIONER KUBOCHI:**   And
16   refresh my recollection, I believe your mother is
17   still alive?

18          **INMATE AMARO.**   Yes, sir.

19          **PRESIDING COMMISSIONER KUBOCHI:**   And what
20   city does she live in?

21          **INMATE AMARO.**   San Jose

22          **PRESIDING COMMISSIONER KUBOCHI:**   Does she
23   share living space with one of your other
24   brothers and sisters or extended family?

25          **INMATE AMARO:**   I have a niece currently
26   living with her which would be Lisa (inaudible)

27          **PRESIDING COMMISSIONER KUBOCHI:**   And is

54

1   your mother physically able to visit you.

2        **INMATE AMARO**   No, sir.

3        **PRESIDING COMMISSIONER KUBOCHI**   Well
4   good.  Counsel, to ensure of any additions or
5   clarifications, I will now have Commissioner
6   Melvin go into Mr. Amaro's post-conviction
7   factors.

8        **DEPUTY COMMISSIONER MELVIN**:  Good morning
9   Mr. Amaro.

10       **INMATE AMARO**   Good morning

11       **DEPUTY COMMISSIONER MELVIN**   During this
12  portion of the hearing  I will cover what you've
13  done since your last BPH appearance which will
14  then take us to the present.  So essentially I'm
15  looking at the time period from June 16, 2004
16  until now, okay?

17       **INMATE AMARO**:  Okay.

18       **DEPUTY COMMISSIONER MELVIN**:  And I
19  prepared for this portion of your hearing by
20  reviewing your C file   I will be reviewing the
21  submissions that you presented  the transcript
22  your last hearing, the files prepared for this
23  hearing which include a Board report from a
24  S. Arnold dated 7/13/06, and then I've also
25  reviewed the psychiatric report from a W.K. Mark
26  dated 8/6/2006 and then I've gone back and
27  reviewed previous psychiatric reports is well.

55

1          **INMATE AMARO**   Okay.

2          **DEPUTY COMMISSIONER MELVIN**

3    essentially let's start with your custody, okay.

4    You're Medium-A custody, placement score 19.  It

5    is noted that you did get your GED in 1988 and

6    you were - it was noted that you were close to

7    having your AA degree.  Did you get your AA

8    degree?

9          **INMATE AMARO**  No, ma'am.

10         **DEPUTY COMMISSIONER MELVIN**  Okay.  And

11   I'm going to read pertinent parts of the Board

12   report for the record and then I will give you

13   and/or Mr. Norton an opportunity to respond to

14   the factors.  Okay.  In the Board report from Dr.

15   Arnold, in his summary he notes that prior to

16   your release you could benefit from remaining

17   disciplinary free, earning positive chronos and

18   continuing with self-help programs when

19   available.  And in reviewing the file it appears

20   that you have done that.  He notes that from the

21   period of 12/05 to 6/06 you participated in AA

22   and NA receiving a mandatory chronos dated

23   3/31/06 and 4/1/06.  In a additional progress

24   report it's noted that during the period of time

25   from 6/04 to 6/05 you were assigned to the Prison

26   Industries Authority maintenance section.  You

27   received all above-average ratings in a..

56

1   categories except quantity of work. And the
2   reports were dated as normal and he was then
3   and then in a progress report that ... that
4   it's noted that you continued in your assignment
5   in the PIA maintenance section and your group
6   activities involved a participation in AA, NA and
7   you did receive Laudatory chronos for that
8   participation.  Any comments on those things?
9        **ATTORNEY NORTON**:  Just to update.  I know
10  that this was dated back in July of '06.  He does
11  have chronos from December 29" of '06 outlining
12  his participation in AA as well as August 7, ...
13  chrono that he's on the waiting list for
14  alternatives to violence project.
15        **DEPUTY COMMISSIONER MELVIN**:  And actually
16  I have not started on the Laudatory chrono part
17  of that yet.
18        **ATTORNEY NORTON**:  Okay.  You mentioned AA
19  so I thought we were into that portion.
20        **DEPUTY COMMISSIONER MELVIN**:  Yeah --
21        **ATTORNEY NORTON**:  I apologize.
22        **DEPUTY COMMISSIONER MELVIN**:  no that's
23  quite all right and I can see how you would think
24  that.  I was basically attempting to go through
25  the Board report and I kind of deferred and
26  mentioned that when I should have probably waited
27  and mentioned it later.  So I'll definitely touch

33

1   upon all of the charges and if I don't please
2   bring it to my attention.

3           **ATTORNEY NORTON:** Thank you very much.
4           **DEPUTY COMMISSIONER MELVIN:** Okay. Now,
5   the psychological report from Dr. Marek in the
6   section regarding assessment of dangerousness
7   the doctor indicates that as compared to other
8   level-2 inmate, your violence potential is
9   regarded as lower. It has been years since you
10  received a 115, and your behavior has improved.
11  Additionally, so has your judgment. If released
12  to the community he feels that your violence
13  potential is considered to be about the same as
14  the average citizen in the community. All things
15  considered, your preincarceration record is not
16  that severe. With the gains you've made here, he
17  believes you should be able to generalize those
18  gains to the community. Significant risk factors
19  and precursors to violence for you would be a
20  return to drug and alcohol use and a return to an
21  irresponsible lifestyle. He says that you have
22  indicated that you have changed and won't ever do
23  that again. You can have fun without them
24  meaning drugs. Any comment?

25          **ATTORNEY NORTON:** I would just like to add
26  a couple of things from the psych report if I
27  may.

54

| | |
|---|---|
| 1 | **DEPUTY COMMISSIONER MELVIN:** State |
| 2 | **ATTORNEY NORTON** ...... |
| 3 | the doctor states: |
| 4 | "Amaro exhibited no psychotic or |
| 5 | depressive symptomatology. He was |
| 6 | calm, cooperative and alert. He |
| 7 | had good insight and judgment |
| 8 | especially as we related to his |
| 9 | crime. His intellectual |
| 10 | functioning was estimated to be in |
| 11 | the average range. His |
| 12 | concentration and attention span |
| 13 | was good. He should receive drug |
| 14 | abuse treatment. His sister has |
| 15 | contacted several alcohol abuse |
| 16 | programs that he can attend when he |
| 17 | is released." |
| 18 | And I would also like to point out Roman numeral |
| 19 | XV under clinical observations, |
| 20 | "Amaro is competent and responsible |
| 21 | for his behavior and he has the |
| 22 | capacity to abide by institutional |
| 23 | rules and has generally done |
| 24 | during his incarceration. He does |
| 25 | not have a mental health disorder |
| 26 | that would necessitate treatment |
| 27 | either during his incarceration or |

```
 1        on parole and if paroled he shall
 2        have conditions, drug and alcohol
 3        and mandatory attendance at a drug
 4        treatment program that parole
 5        decisions should be based on
 6        custody factors."
 7    Thank you.
 8        DEPUTY COMMISSIONER MELVIN:  Any personal
 9    thoughts and/or comments regarding the doctor's
10    report?
11        ATTORNEY NORTON:  No.
12        DEPUTY COMMISSIONER MELVIN:  Okay.  And
13    we'll go on to the disciplinary report and
14    essentially the - there's a total of four 115's
15    and the last one being 12/12/94 for familiarity
16    with staff.  And Mr. Amaro received zero day's
17    loss of work time credit and ten day CTQ which
18    I'm not sure what CTQ means.
19        PRESIDING COMMISSIONER KUBOCHI: We'll ask
20    Mr. Amaro.
21        INMATE AMARO:  Compliant to conaduite
22        DEPUTY COMMISSIONER MELVIN:  What is it
23        INMATE AMARO:  Compliant to conaduite.
24        DEPUTY COMMISSIONER MELVIN:  Oh, okay.
25        PRESIDING COMMISSIONER KUBOCHI:  Can I ask
26    you a question as a follow up on it Mr. Amaro, is
27    because you were beyond your minimum eligible
```

1  parole date they didn't take away good time,

2  right, don't know how it works.

3        INMATE AMARO:  Well, lifers don't receive

4  a (inaudible).

5        PRESIDING COMMISSIONER KUBOCHI:  Okay.

6  You answered it.  I want to know exactly the

7  information that you had to write, please excuse

8  me, not knowing the acronyms or (inaudible).

9        DEPUTY COMMISSIONER MELVIN:  Okay.  And

10  then --

11       PRESIDING COMMISSIONER KUBOCHI:  Before

12  going on - what was this about?  We have some

13  nice, healthy words about, 'Oh, we didn't get

14  really familiar with something,' tell us what

15  it's about.  This is your hearing.

16       INMATE AMARO:  Well, it was a relationship

17  with a female (inaudible), and it developed into

18  - and eventually I married her.

19       PRESIDING COMMISSIONER KUBOCHI:  This

20  is --

21       INMATE AMARO  Pristine

22       PRESIDING COMMISSIONER KUBOCHI

23  Dianne.  And the findings was sustained after yet

24  the punishment didn't occur because you're a life

25  prisoner, is that my understanding?

26       INMATE AMARO:  Yeah.

27       PRESIDING COMMISSIONER KUBOCHI.

37

1   Thank you.

2           **DEPUTY COMMISSIONER MELVIN**:  Was an

3   employee of --

4           **INMATE AMARO**:  Yes.

5           **DEPUTY COMMISSIONER MELVIN**:  -- the

6   facility?

7           **INMATE AMARO**:  Yes.

8           **DEPUTY COMMISSIONER MELVIN**:  Of this one?

9           **INMATE AMARO**:  No, it was in California

10  Men's Colony --

11          **DEPUTY COMMISSIONER MELVIN**:  Okay.

12          **INMATE AMARO**:  San Luis Obispo.

13          **DEPUTY COMMISSIONER MELVIN**:  Okay.  Well,

14  okay   And then we'll go to 128's.  The last one

15  being 1990 and it was for unauthorized state

16  property in cell and what did you have in the

17  cell that you were supposedly not supposed to

18  have?

19          **INMATE AMARO**:  I don't know, honestly

20  don't know.

21          **DEPUTY COMMISSIONER MELVIN**:  And it says

22  office supplies in parens.

23          **INMATE AMARO**:  I don't know what it was

24          **DEPUTY COMMISSIONER MELVIN**:  Okay.  All

25  right.  And any comments, any thoughts.

26          **INMATE AMARO**:  No.

27          **DEPUTY COMMISSIONER MELVIN**:  I said as it

1   to read your Laudatory chronos in to the record
2   Mr. Amaro.  Okay.  We have a Laudatory chrono
3   here dated 9/30/06 and it's from Dave Rodriguez
4   and he indicates that you've been an active
5   participant in AA/NA at CTF and he says that
6   you've been a contributing member of the group
7   since May of '88 and you positively participated
8   and shown ability to understand and comprehend
9   all aspects of the 12-step programs through his
10  own self-improvement techniques.  Mr. Amaro is to
11  be lauded for his continued participation and
12  positive contributions to AA and NA at CTF.  In a
13  Laudatory chronos dated 6/30/06 from Dave
14  Rodriguez, Mr. Amaro is a current member of
15  12-step program.  He's modeled the principles of
16  AA and NA.  You're an active participant in the
17  program.  It goes on to say that you should be
18  commended for your continued participation and
19  positive contributions to AA and NA at CTF.  And
20  a Laudatory chrono dated June 30, 2006 from Dave
21  Rodriguez for the same active participation in AA
22  and NA.  He goes on to say that you should be
23  lauded for your continued participation and
24  positive contributions to AA and NA.  I do have a
25  questions for you.  It sounds that you have been
26  very, very active in NA and AA.  What of the 12
27  steps is the most important to you?

63

1          **INMATE AMARO:**  Excuse me, step four,
2    taking personal inventory of myself and I take
3    daily.

4          **DEPUTY COMMISSIONER MELVIN:**  And a chrono
5    dated 4/1/2006 from Dave Rodriquez, Mr. Amaro is
6    a current member of 12-steps program and he goes
7    on to say that you should be commended for your
8    continued participation and positive chronos in
9    AA and NA.  And a Laudatory chrono dated March
10   31, 2006.  Mr. Rodriguez says the same thing that
11   you should be lauded for your continued
12   participation and positive contributions to AA
13   and NA.  And a Laudatory chrono dated 12/30/01,
14   Mr. Rodriquez notes your participation in
15   12-steps program in AA and NA and he again says
16   you should be lauded for your participation in
17   the program.  And a Laudatory chrono dated
18   12/27/05 from Mr. Rodriguez again, inmate Amaro's
19   active participant in alcohol anonymous and you
20   should be lauded for your continued participation
21   and positive contributions to AA.  And for the
22   sake of not - this is your hearing and on that
23   I'm not going to rush anything but I would like
24   to note that since 2005, actually June of 2005
25   Mr. Rodriguez has provided Laudatory chronos for
26   your participation in AA and what I'll do is
27   basically state the date and I won't go through

64

1  the language in each Laudatory chrono if that's

2  okay.

3        **INMATE AMARO:**  Yes, ma am.

4        **DEPUTY COMMISSIONER MELVIN**   May   I

5  see, 3/31/05, a Laudatory chrono for

6  participation in AA and NA, 4/1/2005 Laudatory

7  chrono for participation in AA and NA, 6/30/05 a

8  Laudatory chrono for participation in AA and NA,

9  6/30/05 Laudatory chrono for participation in AA

10  and NA, September 30, '05, Laudatory chrono for

11  participation in NA and AA, and 10/06/05

12  Laudatory chrono for participation in NA and AA.

13  In addition, you did receive a Laudatory chrono

14  for participation in anger management and that

15  was given by Charlie Walker   And Mr. Walker says

16  that you voluntarily participated in three hours

17  of IEP video review and dialog of issues related

18  to anger management.  He's indicated the various

19  strategies that he believes you've learned

20  through your participation in the video review

21  and dialog  and it is his opinion that you are

22  now capable of understanding anger and

23  controlling your emotions   And he commends you

24  for your efforts to become a productive member of

25  society.  Any comment or clarifications regarding

26  the chronos?

27        **ATTORNEY NORTON**   That as I said is up a

65

1    I'd like to update a few that he has provided for
2    me that I fee whether so the panel will in a that
3    are also included in the packet that was prepared
4    for each of us.

5        **DEPUTY COMMISSIONER MELVIN:**  Okay.

6        **ATTORNEY NORTON:**  This is a 12/29/06
7    chrono for AA and NA.  Also there's a chrono
8    dated 2/13/07 which was yesterday, I guess, by
9    correctional officer A. Salazar in which he
10   writes, "Inmate Amaro has been housed in the east
11   dorm facility for approximately 11 years now.
12   The east dorm is a privileged facility that
13   requires inmates to remain disciplinary free,
14   follow housing regulations as they pertain to
15   security/safety concerns and to program
16   productively in a working environment.  As a
17   facility second watch dorm officer, I've had the
18   opportunity to observe Mr. Amaro throughout his
19   daily activities during the past seven years.
20   He's always respectful to his peers and staff
21   alike by remaining disciplinary free.  In a
22   sensitive environment such as east dorm facility,
23   he demonstrates a mature level of responsibility,
24   tactfulness and concern for himself, staff and
25   inmates who live with him.  He has earned the
26   respect of many who know him.  He has definitely
27   earned mine.  Also, there's a informational chrono

1   dated February 12, 2007, a M. Eucina (phonetic-
2   [illegible]
3   Eucina.  It says,
4           "During the previous 12 years
5           inmate Amaro has been housed at the
6           central facility east dorm.  Having
7           worked as an east dorm patrol
8           officer, I have had the opportunity
9           to observe the overall demeanor of
10          countless inmates.  While at work I
11          had observed this inmate interact
12          positively with both inmate and
13          staff alike.  Though living in a
14          prison setting often makes
15          inmate/staff (as well as
16          inmate/inmate) interactions
17          difficult, inmate Amaro has never
18          allowed such difficulties to stop
19          him from communicating in a
20          positive fashion with everyone
21          His overall attitude is one of
22          respect and willingness [illegible]
23          quote, "Reach out," end quote,
24          others in this manner should be
25          commended.  He is conscientious and
26          respectful in his dealing with
27          staff and does not have any

1        disciplinary problem. These are
2        
3        recognition. It is my professional
4        opinion that Mr. Amaro's
5        willingness to do well in this
6        prison community is indicative of
7        what is expected of a paroling
8        inmate. These are attributes
9        deserving of recognition. This
10       crime was written as a character
11       reference of the person Mr. Amaro
12       is today and I believe Amaro will
13       continue to maintain his positive
14       attitude upon release."
15   And again, that's M. Eucina Industries Patro
16   Officer. And as I indicated earlier, this is a
17   general chrono dated 2/7/2007 that Mr. Amaro is
18   on the alternative to violence project waiting
19   list since August 7, 2006. There's one other
20   memorandum dated February 5, 2007 by F. K.
21   Sterling, Correctional Officer. It reads
22       "On November 21, 2005, I as well and
23       submitted a memorandum to Bob and
24       Prison Terms on behalf of inmate
25       Amaro. As I don't want to take up
26       too much of your time nor repeat
27       myself unnecessarily, I ask that you

44

1      refer once again to said memorandum

2      with the ...

3      convenience.  My reason for

4      submitting the second memorandum is

5      simple yet sincere.  I wish to

6      impress upon this Panel my

7      continued belief in inmate Amaro

8      and the fact that he would be a

9      productive member of society if

10     given the opportunity.  In closing,

11     I must reiterate the fact that I am

12     not in the habit of writing

13     Laudatory chronos/memos on behalf

14     of inmates   Despite the various

15     disappointments and struggles

16     inmate Amaro has had to continually

17     face in prison, he continues to

18     demonstrate an ability to overcome

19     such in a positive and healthy

20     manner.  As such, I believe inmate

21     Amaro will not pose to society his

22     release.  Thank you for your time

23     sincerely R.  Terling.

24  And as far as chronos, yeah  those are it.  Thank

25  you.

26        **DEPUTY COMMISSIONER MELVIN:**  Thank you

27  very much, Mr. Norton.  And I would just like to

45

1   note that in reviewing the Board report there's
2   a penalties of no  hand out not to how it
3   period of time from 3 16:05 to the present and I
4   just want to make sure that my understanding is
5   correct?

6        **ATTORNEY NORTON:**  Actually, I'm glad you
7   brought that up.  There is a certificate of
8   proficiency here dated 12/18/06 for a welder
9   combination mid-welding.  I'll pass that to the
10  Panel.

11       **DEPUTY COMMISSIONER MELVIN:**  Okay.  Thank
12  you.  I have no further questions.  I'll turn it
13  back over to the chair.

14       **PRESIDING COMMISSIONER KUBOCHI:**  What I'm
15  going to do is we'll stay in the room.  In regard
16  to the parole plans what I think is a better
17  thing to do is first of all, I'm going to address
18  the written contents in the purple file holder
19  that your counsel presented to us.  What I've
20  done Mr. Amaro and Mr. Norton is since there's
21  multiple copies  you bought two for the box
22  will be returning one of them because it won't be
23  any dispute as to what be left because he's
24  taking one back.  I note in the middle of those
25  documents and I counted 38 pages I've handwritten
26  on the upper right-hand corner 2/14/07. Miguel
27  Amaro, C88584. hearing exhibit two.  we do have

46

1  an exhibit one. We now have an exhibit two
2  because Mr. Amaro is now what he's presenting
3  because he's taking it back to his cell. Now
4  what I'll do to save time because I'm not going
5  to read everything otherwise we could be here all
6  day if we read verbatim all the letters of
7  support. I've summarized some of the things
8  But I don't think we have to read everything on
9  the record because it's an exhibit. Okay. So
10  there is a recordation of what's been presented
11  what the Panel has considered because it is
12  exhibit two. So I'm going to give a copy to the
13  district attorney, Mr. Amaro, because it's
14  exactly the 38 pages that I've marked is going to
15  be exhibit two

16      **ATTORNEY NORTON:** And my apologies. He
17  did intend for the district attorney to have one.
18      **PRESIDING COMMISSIONER KUBOCHI:** Oh, no
19  problem --

20      **ATTORNEY NORTON.** I forgot to give it to
21  him

22      **PRESIDING COMMISSIONER KUBOCHI**
23  because he gave us two. What I also have is
24  updated material received by the institution and
25  there's letters from Joseph Amaro, Susan Amaro
26  who's in the Air Force, Robert and Sheryl Amaro,
27  Mary Alvarez and Theresa Smith. Likewise there

1    marked - I've numbered those.  They're going to

2    [illegible]

3    I'm not going to read every word in those letters

4    verbatim because they are documents that we are

5    going to review in our deliberations.  Because

6    otherwise we'd be here - we wouldn't be talking

7    about you, we'd be talking about what's

8    typewritten.

9         **ATTORNEY NORTON:**  I understand.

10         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

11    I'm going to give a copy of that and I'm going to

12    let the district attorney see what is exhibit

13    three.

14         **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Thank

15    you.

16         **PRESIDING COMMISSIONER KUBOCHI:**  and I'm

17    going to very briefly go into the parole plans

18    dated August 1st, '06, feel free to make any

19    corrections.  This is summary in nature because

20    everything you've submitted is so voluminous [illegible]

21    [illegible]

22    [illegible]

23    [illegible]

24    do is read stuff into the record

25         **INMATE AMARO:**  Right.

26         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

27    [illegible]

72

1    support from a Mr. Scott Hulett, H-U-L-E-T-T

2    was of ... ... a company ... to offer ...

3    employment to you if paroled. There was list ...

4    as well as the ..., I see some of the same

5    names, but I'm just reading into the record a

6    brief summary of what's been documented already

7    in your Central File.

8          **INMATE AMARO:** I understand.

9          **PRESIDING COMMISSIONER KUBOCHI:** But I

10   believe it's consistent with what we have now.

11   It's from your daughter and your mom, (inaudible)

12   Chavez, and Brissa M-A-N-D-A-C, wrote letters of

13   support requesting your release. Also letters

14   from Sheryl and Robert Amaro are willing to

15   support you, provide residence, transportation

16   and any other safety net that you need if

17   released on parole. Again this is what they're

18   saying to date.

19         **INMATE AMARO:** I understand.

20         **PRESIDING COMMISSIONER KUBOCHI:** Also

21   there is a letter from your mother ... ...

22   stating that she will provide their arrangements ...

23   for you if released. And a letter from the same

24   family in support, and so Joseph and Susan Amaro,

25   also Adolfo Davila, D-A-V-I-L-A, is that his

26   correct name?

27         **INMATE AMARO:** ... ...

49

1       **PRESIDING COMMISSIONER KUBOCHI:** David-

2   the offered the employment the program in

3   the Gold gym?

4       **INMATE AMARO:** Yes, sir

5       **PRESIDING COMMISSIONER KUBOCHI:** And also

6   1/20/06, Trina (phonetic) Sanchez, your aunt

7   offering support and a letter. Now, as I've

8   indicated this is a brief summary from your Board

9   report as well as the documents your attorney has

10  submitted today as well as a (inaudible) report

11  that we received through official channels that

12  are constituted exhibit (inaudible). Is that

13  okay?

14      **INMATE AMARO:** Yes

15      **PRESIDING COMMISSIONER KUBOCHI:** And as

16  I've indicated, I'm a man of my word. I will read

17  everything.

18      **ATTORNEY NORTON:** Commissioner if I may, I

19  don't think you touched on it just prior to that

20  first - actually I don't know what page it is -

21  there but there's a list of support groups

22  including alcoholic anonymous groups that Mr.

23  Amaro is providing to the Panel that he has

24  researched this issue and he understands that

25  he'll be an ongoing participant in alcoholic

26  anonymous.

27      **PRESIDING COMMISSIONER KUBOCHI:** All

1  daughter sent a letter.  She's already contacted

2  the subject of your return the correct

3  correct?

4      **INMATE AMARO:**  My sister.

5      **PRESIDING COMMISSIONER KUBOCHI:**  Your

6  sister?

7      **ATTORNEY NORTON:**  Right, and that was

8  and that list is entailed in there.  Thank you.

9      **PRESIDING COMMISSIONER KUBOCHI:**  I read

10  it.

11      **ATTORNEY NORTON:**  Oh, thank you very much.

12      **PRESIDING COMMISSIONER KUBOCHI:**

13  (inaudible) on that.

14      **ATTORNEY NORTON:**  Thank you.

15      **PRESIDING COMMISSIONER KUBOCHI:**  We have

16  sent out notices, Mr. Amaro, pursuant to Penal

17  Code Section 3042, and those notices go to

18  agencies having a direct interest in your case.

19  Mr. Bushling is here from the Los Angeles County

20  District Attorney's office.  There's also a

21  letter from the Los Angeles County Sheriff's

22  Department opposing your parole, a statement that

23  in the opinion of the Sheriff of Los Angeles

24  County you are a danger to that community if

25  released.  We will read that in it's entirety

26  before we recess for deliberations.  It does not

27  appear that any victim's family members has

1   choose to appear and make a statement.  At the
2   time of the same, the district
3   representative Mr. Rushling will be allowed to
4   make a statement or ask questions.  At this point
5   in time, Mr. Amaro, first the Panel has the
6   opportunity to ask questions of you, then it will
7   be the district attorney, your attorney and then
8   we'll proceed and then do closing statements from
9   the district attorney and your attorney and you
10  as well as we'll read a letter of opposition by
11  the Los Angeles County Sheriff.  I have a couple
12  of questions, Mr. Amaro, and will start with the
13  psychological report dated on or about August of
14  2003 by a staff psychologist, Jeff Howlin, also
15  that's H O W-L-I N, as well as M. Zika, Z I K A
16  and it appears that on page three under the
17  category of assessment of dangerousness I'm going
18  to read into the record a couple of sentences.
19          "Mr. Amaro furthermore he,
20          Mr. Amaro, admits to being
21          intoxicated at the time of the
22          commitment offense.  Because of
23          these things a person's exposure to
24          substances could be said to be a
25          possible precursor to violence.
26          Should this individual choose to
27          abuse substances again, his

76

1   to sponsor group.  I didn't know all that back
2   then, the [illegible] only way I knew
3   with anything was through violence.

4       **PRESIDING COMMISSIONER KUBOCHI**  Can you
5   tell me - I've heard a lot of your institutional
6   therapy, you are a rare individual in that so
7   many people where ever you've been think highly
8   of your work and your behavior while
9   incarcerated, but what other self-help groups or
10  therapies have you been involved with besides
11  AA/NA.

12      **INMATE AMARO**:  Anger management

13      **PRESIDING COMMISSIONER KUBOCHI**  Describe
14  what you took there, the course or whatever,
15  elaborate a little bit for me please.

16      **INMATE AMARO**:  We watched films, we
17  discussed different issues.  People spoke of the
18  problems in the past and they spoke of solutions,
19  how to resolve those problems.  And like I said,
20  for me personally  I never knew there was a rage
21  and anxiety that [illegible]  and
22  pinpointed that [illegible]
23  learned how to control that  And then [illegible]
24  that people bring up to me   For example  I live
25  in a housing setting, 307 or so inmates, that's
26  307 or so different personalities to deal with
27  every day.  Somebody may do something that small

1  bump into me or something and right away I say

2  Excuse me,   or   . get   were   from   like

3  like a duck attitude.  As to before just a list of

4  things said, you know.

5       **PRESIDING COMMISSIONER KUBOCHI:**  Now, this

6  - I realize the tension of life behind the walls

7  but believe me there's more stress out on the

8  streets.  Since you've been incarcerated there's

9  a term called road rage.

10      **INMATE AMARO:**  I don't buy into that

11      **PRESIDING COMMISSIONER KUBOCHI:**  It

12  happens out on the roads nowadays beyond flipping

13  people off, instead of - there's actually been

14  crimes of violence.  Could you tell me what is it

15  about you that's changed that you believe will

16  allow you to handle the stress on the outside?

17      **INMATE AMARO:**  Well my continuous

18  involvement in AA and applying those steps to my

19  life daily.  And once I am released from here the

20  first thing I'm going to do is go to an AA

21  meeting.

22      **PRESIDING COMMISSIONER KUBOCHI:**  We

23  might have jumped off the topic   so   you

24  again tell me how extensive were the anger

25  management programs that you've been involved

26  with and also tell me the years in which you

27  participated.

78

1          **INMATE AMARO:**  I took anger management

2    the first time at . . . . . . . . . . . . .

3    in '94 when I was out at north facility with Dr.

4    Brigman (phonetic).  And then recently last year.

5          **PRESIDING COMMISSIONER KUBOCHI:**  And a

6    couple different topics, in regards to the Board

7    report of 2003 that discuss some of your personal

8    history before the life crime, could you tell the

9    Panel how extensive was your drug problem?

10         **INMATE AMARO:**  It was pretty extensive.

11         **PRESIDING COMMISSIONER KUBOCHI:**  Were you

12   strung out do you think?

13         **INMATE AMARO:**  I was strung out.

14         **PRESIDING COMMISSIONER KUBOCHI:**  What was

15   your dealing - what was your drug of choice?

16         **INMATE AMARO:**  Cocaine.

17         **PRESIDING COMMISSIONER KUBOCHI:**  And could

18   you explain how many months or years you were

19   strung out?

20         **INMATE AMARO:**  I would say a good year and

21   a half, a good year.

22         **PRESIDING COMMISSIONER KUBOCHI:**  Was

23   statement true that you were . . . . . . . . ?

24         **INMATE AMARO:**  Yes, sir

25         **PRESIDING COMMISSIONER KUBOCHI:**  Did you

26   pack any heat?  Did you have any weapons?

27         **INMATE AMARO**  Yes, sir

1       **PRESIDING COMMISSIONER KUBOCHI.** This was

2  it 17

3       **INMATE AMARO:** Yes, sir.

4       **PRESIDING COMMISSIONER KUBOCHI**  to know

5  that in the documents listed as exhibit two, the

6  35-page document, at the conclusion you talked

7  about the disappointment in not getting a parole

8  date previously and how you made a vow to keep on

9  going forward.  Could you describe what process

10  allowed you to make that type of insight and keep

11  things in prospective?

12       **INMATE AMARO:** Again, the 12-step program

13  with God being my higher power.  I apply those

14  based in my life and I learned how, okay, I got

15  problems, (inaudible) good decision, they took it

16  away for the crime.

17       **PRESIDING COMMISSIONER KUBOCHI:** Correct.

18       **INMATE AMARO:** (inaudible), correct, God

19  as a higher power, could (inaudible) my motives.

20  I continue to try to move forward

21       **PRESIDING COMMISSIONER KUBOCHI**    I

22  appreciate your

23       **INMATE AMARO**   I can't  do anything like

24  that cause me to trip.

25       **PRESIDING COMMISSIONER KUBOCHI:** Well,

26  let's put it this way, from my perspective, you

27  had every right to be ticked off and disappointed

58

1  in a lot there, okay.  Are you receptive to ever
2  ...
3  why you would carry that rage before you were
4  incarcerated?  In other words, this is your
5  chance to tell me what happened in your life as
6  to why you'd have that type of rage, become
7  whether involuntarily or not with two people who
8  lost their lives and I'm not asking you about the
9  life crime?

10       **INMATE AMARO:**  Again, it was just from
11  upbringing, you know, balling with drugs  the
12  type of people I was running around with   I
13  lived a lifestyle which led to all of that.

14       **PRESIDING COMMISSIONER KUBOCHI:**  Your
15  father didn't abuse you, did he?

16       **INMATE AMARO:**  Yes.

17       **PRESIDING COMMISSIONER KUBOCHI:**  He did?

18       **INMATE AMARO:**  Very much.

19       **PRESIDING COMMISSIONER KUBOCHI:**  Was he
20  prosecuted?

21       **INMATE AMARO**   N    ??

22       **PRESIDING COMMISSIONER KUBOCHI**
23  strange relationship but ...
24  job once you left the home, right?

25       **INMATE AMARO:**  Yes.

26       **PRESIDING COMMISSIONER KUBOCHI:**  How old
27  were you when he got you that job

1        **INMATE AMARO:** I would say about  I want

2    ...

3        **PRESIDING COMMISSIONER KUBOCHI:** Okay

4    But  okay, so you left home at about 14, that

5    was accurate -

6        **INMATE AMARO:** Yes.

7        **PRESIDING COMMISSIONER KUBOCHI.** -- in the

8    personal history?

9        **INMATE AMARO:** Yes.

10       **PRESIDING COMMISSIONER KUBOCHI** And you

11   used the word in your relationship you called it

12   estranged at the best, no communication at the

13   worst between your father at 14 and when he got

14   you the job?

15       **INMATE AMARO:** True

16       **PRESIDING COMMISSIONER KUBOCHI:** But

17   somehow it reconciled a little bit?

18       **INMATE AMARO:** Yes.

19       **PRESIDING COMMISSIONER KUBOCHI:** It had to

20   reconcile a little bit because you introduced him

21   to his future wife?

22       **INMATE AMARO.** ... We were ...

23   really close

24       **PRESIDING COMMISSIONER KUBOCHI** Yes. I

25   understand that.  This is a sensitive topic and

26   I'm not meaning to revisit something that is very

27   personal to you, but could you elaborate a little

1   bit more about the discovery of your father a

2   ........................................

3   were you, and tell me a little more of the

4   circumstances?

5       **INMATE AMARO:**  This was around 1980 when I

6   was working at - it was the same work with my

7   father, and I worked on a Saturday one day and he

8   and his wife, they were alcoholics.  And one

9   morning or afternoon we were eating lunch, they

10  get in an argument and they're drinking and they

11  start getting physical with one another.  They

12  ended up in the bedroom and I heard two gunshots

13      **PRESIDING COMMISSIONER KUBOCHI:**  You were

14  in the house at the time?

15      **INMATE AMARO:**  Yeah.

16      **PRESIDING COMMISSIONER KUBOCHI:**  You

17  weren't living there, though?

18      **INMATE AMARO:**  No.

19      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

20      **INMATE AMARO:**  I heard two gunshots  after

21  about five seconds.  I ran to the bedroom ......

22  laying on the bed.  She was not on the .........

23  on the floor.  Her head was gone ....... he

24  splattered all over the wall.  I don't seek my

25  father and I hear a moan.  He's slumped against

26  the wall.  He shot himself in the head.  He died

27  on the way to the hospital

83

1        **PRESIDING COMMISSIONER KUBOCHI:** And

2  also ... that was ... stat(ion) ... the ... ...

3  therapy for that.

4        **INMATE AMARO.** No, sir.

5        **PRESIDING COMMISSIONER KUBOCHI:** You were

6  - I noted in your chronology on a separate topic,

7  would it be fair to say that although you were

8  working at the nuclear plant your use of

9  narcotics had already started in 1980?

10       **INMATE AMARO.** Yes.

11       **PRESIDING COMMISSIONER KUBOCHI:** But you

12  were able to maintain well enough to keep the job

13  for a while at the nuclear plant?

14       **INMATE AMARO:** Yes.

15       **PRESIDING COMMISSIONER KUBOCHI:** And

16  ultimately lost it because of doing (inaudible)?

17       **INMATE AMARO:** Yes.

18       **PRESIDING COMMISSIONER KUBOCHI:** One of

19  the things that concern me, Mr. Amaro, is you

20  were about 30 years old at the time of the ...

21  crime; is that correct?

22       **INMATE AMARO** Yes, sir.

23       **PRESIDING COMMISSIONER KUBOCHI** ... the

24  words, it's different than an 18- 19-year-old

25  immature kid falling in with a bad crowd. Thirty

26  years old I assume you were more physically

27  vibrant than today. I'm not calling you who ...

1  muscular guy but you'd worked in a construction

2  [illegible]

3  a mind of your own and a lifestyle of your own.

4  It is concerning when an older more mature adult

5  gets involved with the loss of two lives and on

6  an execution-styles that - why would the Panel

7  feel that you're the same - why wouldn't we feel

8  that you're the same guy today other than you

9  don't take alcohol or drugs because you can't get

10 it in the prison other than the legal kind?

11      **INMATE AMARO:**  Well, at age 30 back then I

12 was a very immature, irresponsible person.  And

13 the knowledge that I obtained during

14 incarceration I didn't have back then.  I didn't

15 know about the sources that I can go to if a

16 problem comes my way.  I didn't know how to deal

17 with it.  And during my incarceration, I was

18 afforded all the different programs that I

19 participated in and again, I (inaudible) my life.

20 I'm not that same person anymore.

21      **PRESIDING COMMISSIONER KUBOCHI:**  [illegible]

22 (inaudible) Mr. Amaro, we all change with [illegible]

23 in regard to [illegible]

24      **INMATE AMARO:**  I've become more mature,

25 responsible, and I understand and gained a lot of

26 insight of the crime.

27      **PRESIDING COMMISSIONER KUBOCHI:**  [illegible]

1   i think you have.  And I do believe you've said :

2   ... ... ... ...

3          **INMATE AMARO:**  And I ll continue to m - -

4   forward.

5          **PRESIDING COMMISSIONER KUBOCHI:**  I have no

6   further questions, commissioner.

7          **PRESIDING COMMISSIONER KUBOCHI:**  Thank

8   you.

9          **DEPUTY COMMISSIONER MELVIN:**  t just have a

10  couple of questions, Mr. Kubochi.  What was you

11  relationship with Mr. Almarez, Daniel:

12         **INMATE AMARO:**  He was my daughter's

13  mother's uncle.  He was a friend.

14         **DEPUTY COMMISSIONER MELVIN.**  You

15  considered him a friend?

16         **INMATE AMARO:**  Yes, as a friend.

17         **DEPUTY COMMISSIONER MELVIN:**  Did you guys

18  use drugs together?

19         **INMATE AMARO:**  No.

20         **DEPUTY COMMISSIONER MELVIN.**  Did you

21  consider him at all ... ... ...

22  to speak at all about the life crime.  Is that

23  correct?

24         **PRESIDING COMMISSIONER KUBOCHI:**  I believe

25  he said if you have any specific questions he's

26  be more than happy to --

27         **DEPUTY COMMISSIONER MELVIN.**  Okay

                                                64

1    guess I'm wondering at one point it seems as

2    though Mr. Gamez is the one that was away

3    from Daniel and in my mind it seems that you

4    could have helped Mr. Gamez rather than

5    assisted Daniel in doing what he wanted to do.

6    And so I'm wondering why you would kind of follow

7    what Daniel wanted you to do in helping him kill

8    and of course you, kill Mr. Collier and Mr.

9    Walker?

10          **INMATE AMARO**.  I understand the question,

11   and the only answer I can give back at the same

12   was my state of mind.  I was intoxicated and the

13   frame of mind I had back then things just

14   happened so fast and when I look back it's like

15   there's numerous chances I could have gotten

16   away, called the proper authorities, you know,

17   things wouldn't never had happened the way it is.

18   You know, I'm very sorry that two lives were

19   taken.

20          **DEPUTY COMMISSIONER MELVIN**.  Okay.

21          **INMATE AMARO**.  And the only answer I can

22   give is that I was intoxicated. I can't say that my

23   state of mind, this is not an excuse, I'm not trying to

24   justify it.

25          **DEPUTY COMMISSIONER MELVIN**:  What my

26   concern is in addition to having life-long

27   problems with drugs and alcohol, you were very

87

1  that. My concern is that if somebody else told

2  you to do something you have it appropriate

3  you just do it. You don't have your own thoughts

4  and you don't exercise your own judgment. And I

5  guess I'd like you to respond to that.

6      **INMATE AMARO:** The kind of character I had

7  back then was - I didn't have no character back

8  then. I sit here as of today and in the midst of

9  adversity I don't care what it is I'm not doing

10 something that's wrong anymore. And my

11 institutional record will reflect that.

12     **DEPUTY COMMISSIONER MELVIN:** No further

13 questions.

14     **PRESIDING COMMISSIONER KUBOCHI:** Thank

15 you, commissioner.

16     **DEPUTY COMMISSIONER MELVIN:** Thank you.

17     **PRESIDING COMMISSIONER KUBOCHI:** At this

18 time I will ask Mr. Bushling of the Los Angeles

19 County District Attorney's Office whether or not

20 you have any questions?

21     **DEPUTY DISTRICT ATTORNEY BUSHLING** Yes I

22 a couple if I could, thank you.

23     **PRESIDING COMMISSIONER KUBOCHI** Would you

24 direct them to the Panel?

25     **DEPUTY DISTRICT ATTORNEY BUSHLING:** Yes.

26 I would like to go back to that 1971 incident

27 where the inmate used a brick on a police

1  officer's face and seriously injured him.  I'm
2  wondering if the inmate was injured ... ... ...
3  during that altercation.

4      **PRESIDING COMMISSIONER KUBOCHI**   ... .
5  injured during that park?

6      **INMATE AMARO:**  Just bruises, cuts and
7  bruises, nothing that needed real medical
8  attention.

9      **PRESIDING COMMISSIONER KUBOCHI:**   Thank
10  you.

11      **DEPUTY DISTRICT ATTORNEY BUSHLING.**  And
12  that incident occurred in 1971.  The inmate was
13  also in the army in 1971.  Did this incident
14  occur before or after the army stint.

15      **INMATE AMARO:**  I will say after.

16      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  And
17  the inmate if I'm correct was in the army for two
18  months?

19      **INMATE AMARO:**  Yes, sir.

20      **DEPUTY DISTRICT ATTORNEY BUSHLING**  And I
21  don't know that this is important but how did the
22  inmate get into the army with that previous ...
23  and wasn't discovered until two months after he
24  got in and --

25      **INMATE AMARO:**  Well, at the time when or
26  during, there was people going in there with one
27  leg, one arm.  It was just a get as you get ...

1        **PRESIDING COMMISSIONER KUBOCHI**  What year

2  was that

3        **INMATE AMARO.**  197

4        **PRESIDING COMMISSIONER KUBOCHI**  M:

5  Bushling --

6        **DEPUTY DISTRICT ATTORNEY BUSHLING:**  I

7  understand.

8        **PRESIDING COMMISSIONER KUBOCHI**  yeah

9  it was - the times are different.  He might not

10  have known the physical limitations that the arm

11  imposed later once he enlisted.

12        **DEPUTY DISTRICT ATTORNEY BUSHLING**  I

13  understand.  And if I could jump ahead to 199

14  the inmate - my understanding is (inaudible,

15  asked someone in the institution to make a knife

16  for him?

17        **PRESIDING COMMISSIONER KUBOCHI:**  What I'd

18  like to do there is counsel, could you clarify

19  whether there was some - well, I'm going to have

20  the deputy commissioner Melvin clarify whether

21  that is an appropriate question

22        **DEPUTY COMMISSIONER MELVIN**

23  (inaudible)

24        **PRESIDING COMMISSIONER KUBOCHI:**  To Mr.

25  Bushling or --

26        **DEPUTY COMMISSIONER MELVIN:**  To your

27  question.

1        **PRESIDING COMMISSIONER KUBOCHI:** By the

2   terms

3        **DEPUTY COMMISSIONER MELVIN.** Okay, so

4   he was assessed 30 days loss of credit, so a

5   good cause finding was made on the charge so --

6        **PRESIDING COMMISSIONER KUBOCHI:** Great,

7   Commissioner Melvin, that is an appropriate

8   question, could you rephrase that for me please

9        **DEPUTY DISTRICT ATTORNEY BUSHLING:** Yes, I

10  just wanted to know the facts - did he ask

11  someone in prison to make a knife for him?

12       **PRESIDING COMMISSIONER KUBOCHI:** That's

13  his question, Mr. Amaro, you can answer whatever

14  you perceive to be the truth?

15       **INMATE AMARO:** The truth well, at the time

16  when I spoke of getting a weapon, but the person

17  misinterpreted what I said and told the

18  authorities that. I never asked them if they

19  could do it.

20       **PRESIDING COMMISSIONER KUBOCHI:** I'd like

21  a little clarification on that myself, so that,

22  like it's splitting hairs

23       **INMATE AMARO** Well, at the time this guy

24  was accusing me of having an affair with the CO

25  which wasn't true. And I know the ramifications

26  of that if you're get caught. So I got upset and

27  I mentioned this to the person and he went to the

89

1    authorities and said that I asked him to make me

2    one but I didn't ask him to make me to

3         **PRESIDING COMMISSIONER KUBOCHI**: What was

4    your --

5         **INMATE AMARO**: At the time I wouldn't need

6    nobody to make me a weapon, I could do it myself.

7         **PRESIDING COMMISSIONER KUBOCHI**: What was

8    the exact statement you did make?

9         **INMATE AMARO**: I told him that at the time

10   I was thinking of getting a weapon.

11        **PRESIDING COMMISSIONER KUBOCHI**: Okay.

12   Thank you. Is that satisfactory, Mr. Bushling?

13        **DEPUTY DISTRICT ATTORNEY BUSHLING**: Yes,

14   thank you.

15        **PRESIDING COMMISSIONER KUBOCHI**: And I

16   apologize Mr. Amaro, I almost spoke over your

17   statement. I apologize.

18        **INMATE AMARO**: Apology accepted.

19        **DEPUTY DISTRICT ATTORNEY BUSHLING**: Along

20   the lines of what the inmate just said about the

21   ramifications of creautib of getting some one

22   with an employee or staff. It was subsequent to

23   that the inmate did not involved with staff. Is

24   that correct?

25        **DEPUTY COMMISSIONER MELVIN**: You want to

26   ask him?

27        **DEPUTY DISTRICT ATTORNEY BUSHLING**: Well,

92

1 I'm asking it - I'm directing it --

2        PRESIDING COMMISSIONER KUBOCHI:

3 answer whether or not that incident with the

4 (inaudible) and not the conversation, was that

5 related to having the relationship with a

6 employee of the Department of Corrections?

7        **INMATE AMARO:** That one, no.

8        **PRESIDING COMMISSIONER KUBOCHI:** Two

9 different affairs?

10        **INMATE AMARO:** Yes, sir.

11        **PRESIDING COMMISSIONER KUBOCHI:** On

12 circumstances?

13        **INMATE AMARO:** Circumstances.

14        **PRESIDING COMMISSIONER KUBOCHI:** Two

15 different circumstances, counsel.

16        **DEPUTY DISTRICT ATTORNEY BUSHLING:** Right

17 but a couple more quick questions.

18        **PRESIDING COMMISSIONER KUBOCHI:** Sure

19        **DEPUTY DISTRICT ATTORNEY BUSHLING:** Some

20 where in the file I read that the inmate has a

21 fear of MA?

22        **PRESIDING COMMISSIONER KUBOCHI:**

23 You had a question sir

24        **INMATE AMARO:** Did you want me to answer

25 that?

26        **PRESIDING COMMISSIONER KUBOCHI:** No I

27 believe you clarified it to counsel's

1   satisfaction, did he not?

2          **DEPUTY DISTRICT ATTORNEY BUSHLING** Yes
3   yes, he did.  And somewhere in the file and the
4   inmate may not recall this I recall reading that
5   the inmate has expressed a fear of the MA; is
6   that correct?

7          **INMATE AMARO:** Yes, sir.

8          **DEPUTY DISTRICT ATTORNEY BUSHLING.** And
9   why is that?

10          **INMATE AMARO:** Well, I was assaulted in
11   the County jail while I was --

12          **ATTORNEY NORTON:** Your Honor, I don't
13   think that's relevant, counsel.  I'm not going to
14   allow that question.

15          **DEPUTY DISTRICT ATTORNEY BUSHLING.** All
16   right.  Was Mr. Almarez a gang member?

17          **ATTORNEY NORTON:** I'm not going to allow
18   that question.

19          **DEPUTY DISTRICT ATTORNEY BUSHLING:** The
20   rage that the inmate says that he feels when he
21   under the influence or something, I'm not sure
22   maybe he answered it, does the inmate know who
23   causes that?

24          **PRESIDING COMMISSIONER KUBOCHI:** Mr. -- just
25   for the record, yeah, could you answer his
26   question?

27          **INMATE AMARO:** No.

1          **PRESIDING COMMISSIONER KUBOCHI**: Any other
2   questions?

3          **DEPUTY DISTRICT ATTORNEY BUSHLING**: No
4   that's it. Thank you.

5          **PRESIDING COMMISSIONER KUBOCHI**: Mr.
6   Norton, you may now have the opportunity to ask
7   questions of Mr. Amaro.

8          **ATTORNEY NORTON**: I have no questions.

9          **PRESIDING COMMISSIONER KUBOCHI**: Okay.
10  Thank you. At this point Mr. Amaro, we will now
11  have closing statements but before doing so, I'd
12  like to read into the record a letter from the
13  Sheriff's Department of Los Angeles County dated
14  August 30, 2006 and I'm quoting,

15          "We have received notification that
16          inmate Amaro was scheduled to
17          appear before the Board of Prison
18          Terms for a hearing to be held on
19          October 4, 2006. It should be
20          noted that the notice of hearing
21          was initially sent to the Los
22          Angeles Police Department (the Los
23          Angeles County Sheriff's
24          Department/Homicide Bureau
25          investigating into (inaudible) for
26          inmate Amaro's commitment. To
27          assure a timely response, all

1       future requests for information

2       [illegible]

3       Angeles County Sheriff's

4       Department, Homicide, 5-7-4-7-

5       Rickenbacker Road,

6       R-I-C-K-E-N-B-A-C-K-E-R Road,

7       Commerce, California 9-0-0-4-0.

8       The following represents a summary

9       of the facts as contained in the

10      homicide bureau files and is

11      submitted for your consideration

12      On the night of December 5, 1982,

13      James Tokumoto and Collier and Mr.

14      Walker went to the residence of

15      Robert and Daniel Almarez in the

16      Lennox area of Los Angeles. Also

17      present were inmate Miguel Amaro

18      and Jeff Sagmeister who were

19      associates of the Almarez brothers.

20      During a dispute over a drug

21      transaction Daniel Almarez [illegible]

22      a revolver. Tokumoto turned the

23      kitchen table causing Daniel

24      Almarez to fall out of his chair

25      and then tried to escape. Almarez

26      caught him and struck him several

27      times in the head with the

1    revolver. As the two struggled

2    [illegible]

3    and Robert Almarez entered with a

4    second revolver. Daniel Almarez

5    knocked Tokumoto to the ground and

6    Robert shot him as he tried to

7    rise. Robert then held Collier and

8    Walker at gun point while Daniel

9    stole Tokumoto's wallet, money and

10   watch and robbed Collier and

11   Walker. They then bound and gagged

12   Collier and Walker. Inmate Amaro

13   took the two men out to a vehicle

14   and drove them with the Almarez

15   brothers to a location in Manhattan

16   Beach to murder them. When they

17   were ordered out, Walker broke free

18   and ran pursued on foot by Almarez.

19   Daniel Almarez and inmate Amaro

20   loaded Collier back into the car

21   and fled. Walker flaged Almarez

22   and called the police. They then

23   arrested him in the area. Inmate

24   Amaro drove Collier and Daniel

25   Almarez to a location and

26   (inaudible) Almarez executed

27   Collier. They then returned to the

```
 1          apartment where they loaded the
 2          body of their victim, cut it
 3          and dumped it at a third location
 4          in Gardena.  Based on these facts,
 5          it is the opinion of this
 6          Department that parole of inmate
 7          Amaro is inappropriate and should
 8          be denied.  Sincerely, Lee Roy
 9          Bach, B-A-C-H, Sheriff.  Signed
10          Raymond, Peavy, P-E-A-V-Y, Captain,
11          Homicide Bureau."
```

12 At this time, Mr. Bushling of the Los Angeles

13 County District Attorney's office will be allowed

14 an opportunity to make his closing statement.

15         **DEPUTY DISTRICT ATTORNEY BUSHLING**    The

16 district attorney's office is opposed to the

17 finding of suitability at this time.  The inmate

18 has presented way back up to or beginning in 1971

19 and presumably that was just part of this

20 personality, but and an extremely violent

21 character.  Assaulting a police officer with a

22 brick in the face, and I might object to the

23 inmate was so so said required no medical

24 attention.  Up to the 1990's there were incidents

25 of course the commitment offense was in the

26 middle of there.  He had a problem even in the

27 1990's with following the rules in state prison.

1   The inmate has admitted that he carried a gun

2   ...

3   violence with this inmate and also that his

4   fault of his also surrounding his and I to

5   terrible sympathy or great sympathy for the

6   things that he did witness in his life which are

7   no fault of his, but even before those incidents

8   he's been a violent person.  The question that

9   the Board has to ask is what would make this

10  Board believe that he's no longer an unreasonable

11  risk, why is he no longer that violent person

12  And I believe that the inmate to be quite honest

13  has made progress.  He strikes me as someone who

14  has made some progress.  But he needs of I

15  believe answer more questions, give more insight

16  into what makes him feel the kind of rage that

17  causes him to commit these kinds of violent acts.

18  At this point he doesn't know why he feels the

19  rage.  And I think after 20-something years in

20  the state prison, he should be able to answer

21  that question before the Board finds that

22  suitable.  Thank you.

23       **PRESIDING COMMISSIONER KUBOCHI**  That

24  you, Mr. Bushling.  At this time, Mr. Norton, it

25  is your opportunity to address the Panel

26       **ATTORNEY NORTON:**  Yes, thank you.  The

27  crime for which Mr. Ayers was convicted of

1  counts of murder.  But it's undisputed that in

2  [illegible]

3  reading through the appellate transcript the

4  facts produced from trial and reiterating that in

5  all the transcript it's clear that Daniel and

6  Robert Almarez were the perpetrators in this

7  crime and Mr. Amaro while a somewhat unwilling

8  participant didn't participate and was convicted

9  under the theory of felony or he was again not

10  the shooter in either case  I think als[o]

11  significant is the testimony of Mr. Sagmeister

12  wherein he testified and again this is in the

13  appellate transcript that Mr. Amaro was told what

14  to do by Daniel Almarez and that according to

15  Mr. Sagmeister, Mr. Amaro looked terrified.  I

16  think I bring that out because that does support

17  previous testimony by Mr. Amaro that he was

18  fearful of Mr. Daniel Almarez.  Mr. Daniel

19  Almarez was previously convicted of manslaughter

20  and he was [illegible] fearful of him.  And I would

21  point out tha[illegible]

22  in th[illegible]

23  Robert Almarez muc[illegible] detriment

24  regarding his own personal safety.  And it

25  doesn't mitigate the fact that two people's lives

26  were lost but regarding mitigating factors in the

27  Board report, mitigating factors are listed in

1    that the inmate had no apparent predisposition

2    commit the crime but was induced by the

3    participate in it's commissioner, and number two

4    the inmate was a passive participant or played a

5    minor role in the commission of the crime, and

6    again, I don't believe that anyone disputes that.

7    And I point this out because I believe under

8    Title 15 and under Penal Code Section 3041, 3041.

9    Mr. Amaro is entitled to individual consideration

10   for his parole. And I think what's also

11   significant is that his first trial resulted in

12   an acquittal on the robbery charges and a hung

13   jury on the kidnap and murder charges. Again,

14   just to reemphasize, Mr. Amaro was not the

15   shooter but he has in previous Board reports as

16   well as testimony in previous hearings, he has

17   accepted responsibility then but for his

18   participation these individuals may not have been

19   killed, and I know he'll speak to that in his

20   suitability statement. Furthermore, he was at

21   the time. This was a time in which he was under

22   the influence of alcohol, which clouded

23   judgment. And he testified previous space he

24   was such back then that he was a follower. He's

25   not the follower today. Twenty-five years later

26   this is a changed man. The rehabilitative

27   process of CDC&R has worked with Mr. Miguel

1  Amaro. In 2004 the Panel split on it's decision

2  and the panel went [...] appointed [...]

3  they denied Mr. Amaro based on crime alone. As

4  we all know, the facts of this crime will never

5  change, but that's why I went to lengths to point

6  out that the crime while horrible in that two

7  people lost their lives and fortunately a third

8  was able to escape, Mr. Amaro was a passive

9  participant of this crime and as such he does

10 deserve individual consideration. I think the

11 time has come for this Panel to find Mr. Amaro

12 suitable for parole and this is because there is

13 in my -- there is no evidence that his release to

14 the community would pose an unreasonable risk of

15 danger to society or a threat to public safety.

16 In the 25 years that he's been incarcerated, he

17 has no record of violence. I think that's

18 extremely important to point out. And he has

19 participated in significant self help over the

20 years. Furthermore, because drugs and alcohol

21 were a significant factor in the commitment

22 offense, at least his participation -- he has no

23 write ups in prison in [...] years [...]

24 for drugs or alcohol. And as we all know, drugs

25 and alcohol are available. In the institution

26 albeit legally or obviously. Furthermore, I read

27 into the record [...]

1   correctional officers who have known this man in

2   [illegible]

3   I think that is a greater indication than

4   anything. It's very rare that you see

5   correctional officers writing letters of support

6   for parole for inmates. And this man has at

7   least two, I think three. Additionally,

8   psychological evaluation reports going back to at

9   least the year 2000 are all supportive of

10  release. These are expert psychologists who have

11  written, their opinion is that his risk

12  assessment to the free community would be no

13  greater than that of the average citizen. There

14  is the caveat of course, that he abstain from

15  drugs and alcohol, something he's been able [illegible]

16  25 years of incarceration and he has a solid plan

17  to maintain the sobriety upon release to the free

18  community including having taking the initiative

19  to contact and find out where AA meetings are

20  held, where you'll be paroled. He's maintained

21  solid relationships with friends and family [illegible]

22  free community. He again has a place [illegible]

23  he has a [illegible]

24  earlier the rehabilitative process has worked

25  for Mr. Amaro. It's time for this Panel to find

26  him suitable for parole with the condition of

27  parole that [illegible]

1   Thank you.

2          **PRESIDING COMMISSIONER KUBOCHI**   Bank

3   you, Mr. Norton.  Mr. Amaro, this is your

4   opportunity to address the Panel if you wish to

5   do so.

6          **INMATE AMARO:**  I do.  I wrote down my

7   closing statement.  If I may I'd like to read it.

8          **PRESIDING COMMISSIONER KUBOCHI**

9   Absolutely, this is your hearing.

10         **INMATE AMARO**  There are a few reasons why

11  I believe I should be paroled.  I feel that I am

12  ready to be paroled because of what I have

13  learned throughout my years of incarceration.  As

14  the serenity prayer says, 'God grant me the

15  serenity to accept the things I can't change

16  courage to change the things I can, and the

17  wisdom to know the difference.'  So the many

18  things I have learned change has to begin within

19  me and an inward change, hence, I have done

20  everything possible to help me become a better

21  person.  In the process of me becoming and

22  remaining sober I have grown spiritually

23  today God is my higher power and my guide one day

24  at a time  Step three in the 12 step threes,

25  made a decision to turn my will and life over to

26  the care of God as I understand it.  Once sober I

27  realize how much alcohol and drug abuse has

1   clouded my judgment and how my conscious could

2   ... to a better life ... made a

3   decision to let my conscious be my guide. In

4   doing so, I've been able to deal with my ...

5   and drug problems one day at a time. Though I

6   received a split decision of suitability and was

7   taken away in 2004, I did not falter emotionally

8   or spiritually nor allowed it to change who I am

9   today.  Rather, I became motivated by this

10   disappointment and made a decision to continue to

11   strive forward, continuing to grow more-

12   spiritually and emotionally.  I continue to

13   attend AA and also participate in a couple of

14   anger classes  I did not allow myself to become

15   bitter again  that alone should show the Panel

16   how I have changed for the better.  Also there

17   are several Laudatory chronos written by

18   correctional officers who see me on a daily basis

19   that can reflect on my positive character.

20   Throughout the past years, I've learned that

21   these qualities I now possess will certainly ...

22   an asset to me and those around me as ...

23   and will help me to succeed in life.  My parole

24   plans are very concrete.  I know that both having

25   employment and a place of residence is a concern

26   of this Panel.  I have two guaranteed job offers

27   immediately on my release which ...

1   Gold Gym which is owned and operated by a family

2   friend and [illegible] Johnson Street,

3   Hollister, California, phone number

4   8-3-1-6-3-7-8-1-2-2.  Fax number

5   8-3-1-6-3-7-6-0-8-4.  Owner's name is Adolfo

6   Davila and there's also a construction job

7   offered by also a family friend which is located

8   at Hulett Construction, 1-7-1-4-0 Wilson Way,

9   Royal Oaks, California, 9-7-0-7-6-7-1-5-7.  Phone

10  number is 4-0-8-5-1 5-5-9-0 5.  Owner's name is

11  Scott Hulett.  As for housing, I have numerous

12  places I will be able to reside at such as Maric

13  (inaudible) mother, 4-8-0 Lamina (phonetic) Lane

14  San Jose, California 9-5 1-1-1.  Her phone number

15  is 4-0-8-2-8-1-4 3 8 7.  Maria D. Gomez, sister

16  2-8-0 North 8th Street, Apartment three, San

17  Jose, California, 9-5-1-1-1.  Phone number

18  4-0-8-2-9-8-2-1-6-6.  Robert and Sheryl Amaro,

19  brother and sister-in-law, 3-7-2-9 Springs Ball

20  Court, (inaudible) City, Maryland, phone number

21  4 3 0 3-6-1 7-4 5-4.  My family has been very

22  supportive and my final nephews have also

23  offered me financial assistance and are willing

24  to help me purchase a vehicle.  My sister is

25  willing to be my AA sponsor and has took it upon

26  herself to locate several addresses which list

27  the various AA meetings available around the area

1   I will be living and I decided to attend one in

2   the particular area closest to where I will be

3   staying which is our Lady of Guadalupe Church

4   Adult Program. Phone number is

5   4-0-8-2-5-8-7-0-5-7 which is they have therapy

6   programs there.  And then Alcoholic Anonymous

7   program is 2-7-4-East Halington (phonetic)

8   Avenue.  Phone number is 4 0-8-3-7-4-5-7-5 1.

9   This is where I will directly go to once release

10  for I know I must continue attending meetings and

11  work to (inaudible).  Finally, I choose to live

12  with my mother.  She is getting older and I would

13  like to take care of her and enjoy our time

14  together as I know it is now short.  In closing,

15  I ask that you take all I have touched on in

16  consideration and allow me a second chance by

17  granting me parole.  Thank you all for your

18  patience and time.

19          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you

20  for your comments Mr. Amaro.

21          **INMATE AMARO.**  Thank you.

22          **PRESIDING COMMISSIONER KUBOCHI**  Let's

23  recessing and deliberation.  Mr. Bushling, have

24  you had a chance just to look at these documents.

25  You've been provided a copy.

26          **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Yes, I

27  have.  I've had a

1        **PRESIDING COMMISSIONER KUBOCHI:**  And then

2        ... ... ...

3        going into deliberations t -

4        **DEPUTY DISTRICT ATTORNEY BUSHLING.**  A

5        right.

6        **PRESIDING COMMISSIONER KUBOCHI:**  -- want

7        the verbal record to reflect that each of you

8        have had an opportunity to review the exhibits as

9        to its content because as I indicated with Mr.

10       Amaro's agreement, we're not going to sit here

11       and read all of that information verbatim int

12       the record.  They are marked as exhibits, they

13       will be exhibits for purposes of this hearing

14       **ATTORNEY NORTON:**  It is - commissioner.

15       this one is marked exhibit three.  I don't see

16       any markings on these other pages.

17       **PRESIDING COMMISSIONER KUBOCHI:**  He passed

18       you the wrong one.

19       **ATTORNEY NORTON·**  Oh.

20       **PRESIDING COMMISSIONER KUBOCHI:**  Page --

21       was marked exhibit   is the page one which

22       have in your hand, Mr. Nort

23       **ATTORNEY NORTON·**  Yes

24       **PRESIDING COMMISSIONER KUBOCHI:**  No, see

25       it's not - you've taken the unnumbered ones.  You

26       have another copy?

27       **DEPUTY DISTRICT ATTORNEY BUSHLING**

1   him everything that I received.

2          PRESIDING COMMISSIONER KUBOCHI:

3   I past around - oh, I apologize. It came back

4   already. You gave me your copy.

5          DEPUTY DISTRICT ATTORNEY BUSHLING:  Yes.

6          PRESIDING COMMISSIONER KUBOCHI:  It came

7   back. The officer is so efficient. It is the 35

8   pages. You have the same thing. I apologize.

9   It already circulated in the room.

10         DEPUTY DISTRICT ATTORNEY BUSHLING:

11  thought you were making me give up my copy.

12         PRESIDING COMMISSIONER KUBOCHI:  Yeah, no.

13  I'm sorry. Thank you.

14         ATTORNEY NORTON:  And yes, I would return

15  these. I am acknowledging these have been marked

16  as exhibit one, two and three. And also with the

17  Panel's permission I am submitting something I

18  forgot to submit earlier, it's a forklift license

19  issued to Mr. Amaro.

20         PRESIDING COMMISSIONER KUBOCHI:  you can

21  give it back to Mr. Amaro. I have you put it in

22  in your exhibit.

23         ATTORNEY NORTON:  Thank you very much.

24         PRESIDING COMMISSIONER KUBOCHI:  It

25  expires this year. You paid $110 plus tax. I

26  looked at that license.

27         INMATE AMARO:  He, that's during training

1   sir

2           **PRESIDING COMMISSIONER KUBOCHI**

3   got a fork lift license too, I've seen it.

4           **ATTORNEY NORTON:**  Thank you.

5           **PRESIDING COMMISSIONER KUBOCHI:**  Sorry

6   about that but I do want you to think I pay

7   attention to whatever you say and submit.

8           **INMATE AMARO:**  Thank you.

9           **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

10  The time is 12:17, we'll be in recess and

11  deliberations.  Thank you very much.

12                        R-E-C-E-S-S

13                          --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

        **D E C I S I O N**

3       **DEPUTY COMMISSIONER MELVIN:** ...

4   information I did turn the tape on ... it ...

5   can wait.

6       **ATTORNEY NORTON:** Oh I --

7       **DEPUTY COMMISSIONER MELVIN:** I thought he

8   was ready.

9       **ATTORNEY NORTON:** I was going to wait for

10  Stan to get back before I actually bring in

11  Mr. ...

12      **DEPUTY COMMISSIONER MELVIN:** We are on

13  record.

14      **PRESIDING COMMISSIONER KUBOCHI:** The time

15  is about 1:31 p.m. in the matter of Mr. Amaro

16  there is a split of opinion in regard to your

17  suitability for parole. I will read my factors

18  and findings that having reviewed all the

19  information from the public and relied upon the

20  circumstances of your life crime as well as your

21  progress and programming in state prison that

22  that you are not suitable for a parole and would

23  pose an unreasonable risk of danger to society or

24  a threat to public safety if released from prison

25  on the grounds that this offense was carried out

26  in an especially cruel and callous manner in that

27  **MIGUEL AMARO C-88580 DECISION PAGE 1 2/14/07**

1  one victim, Tokumoto was invited over by Daniel
2  Almarez to the residence. Mr. Tokumoto brought
3  over two friends at the house. The justification
4  for the killing the sheriff indicated it was a
5  drug transaction gone bad. There is other
6  information that Mr. Tokumoto had some contact
7  with Mr. Alvarez' girlfriend that caused
8  Mr. Alvarez to have ill feeling. But considering
9  two people were killed that night the motive for
10  the crime was inexplicable and very trivial in
11  relationship to the loss of two lives. The way
12  that the crimes were carried out shows a
13  dispassionate, calculated manner in that it was
14  almost execution style. Mr. Tokumoto was shot in
15  the kitchen. The two other people Walker and
16  Collier was found. Their wallets were taken from
17  them at the house. They were taken in a car
18  driven by you. The two Almarez brothers had
19  handguns at the time. They drove to one location
20  near Manhattan Beach where Mr. Walker was able to
21  escape. Mr. Collier was put back in the car and
22  shot three times in the head, and body was
23  dumped. You were the driver of the car at the
24  time. After that incident you went back over to
25  the Almarez residence and assisted Daniel in
26  taking Tokumoto's body and dumping him in
27  **MIGUEL AMARO C-88580  DECISION PAGE 2  2/14/07**

1   Gardenia in a grassy area.  The crimes indicate

2   that they were multiple in the reason and

3   for these reasons including the fact that you

4   have an escalating pattern of criminal conduct

5   starting off with the incident in 1971 where you

6   were involved with hitting a peace officer with a

7   brick after a (inaudible).  I find that in each

8   instance your explanation was to blame other

9   people or blame circumstances that were totally

10  out of your control and yet you involved yourself

11  voluntarily with assaultive behavior and it is

12  more than other people's fault for the ingestion

13  of alcohol or drugs that triggers this type of

14  violent conduct.  In addition, I find that you

15  have not sufficiently participated in beneficial

16  self-help.  I praise you for participating in

17  Alcohol Anonymous.  I praise you for the therapy

18  that you have obtained.  However, it's clear that

19  manner in which the crime was committed in regard

20  to having these three people two of which were

21  killed ranging over three different times in on

22  the Los Angeles area.  Clearly involved in one

23  period in which you had hostile feelings or

24  uncontrollable feelings regarding your

25  participation in those crimes.  And you need a

26  little more therapy, a little more insight in

27  **MIGUEL AMARO C-88580   DECISION PAGE 3   2/14/07**

41

1   regard to why you have this rage and how you have
2   moved [illegible] that simply taking illegal [illegible]
3   drugs can cause you to have - what I recall an
4   itchy trigger finger regarding your response with
5   rage and anger toward others.  The district
6   attorney of Los Angeles County pursuant to the
7   Penal Code notices, the 3042 indicates his
8   opposition in your parole suitability as well as
9   the Los Angeles County Sheriff's Department.
10  Further in regard to other factors that you
11  ingest mind altering substances and your risk of
12  violence is very high.  Simply telling the Board
13  that you will refrain from alcohol does not
14  address the underlying issues that appear to be
15  your problem, and it is a finding that you can't
16  benefit from further therapy before being
17  released back into society.  For all of these
18  reasons, I find you not suitable for parole at
19  this time.

20        **DEPUTY COMMISSIONER MELVIN:**  I have
21  reviewed all of the information submitted from the
22  public, and reviewing the following status of the
23  is concluding that the prisoner is probable for
24  parole and would not pose an unreasonable risk of
25  danger to society or a threat to public safety if
26  released from prison.  The prisoner has no
27  **MIGUEL AMARO** C-88580   **DECISION PAGE 4**  7/14/07

1    juvenile record of assaulting others, has a

2    _____

3    stable relationships with others.  In particular

4    Mr. Amaro, you've mentioned that you keep in

5    contact with your brothers Joseph and Robert

6    seeing them every other year, your sister Angie,

7    seeing her every year, your sister Maria, seeing

8    her twice a month and your sister Theresa, seeing

9    her once a year.  In addition, you mentioned that

10   you keep in contact with your niece, your nephew

11   your daughter, your wife and your mother.  While

12   in prison has enhanced his or her ability to

13   function within the law upon release through

14   participation in educational programs

15   specifically you have received your GED back in

16   1998, excuse me 1988 and you were close to

17   getting your AA degree.  Additionally you have

18   provided many Laudatory chronos indicating your

19   participation in AA, NA and anger management.  In

20   addition to that, you've indicated that you did

21   _____

22   your forklift license and _____

23   _____

24   hearings wherein it was indicated that you have

25   vocational training in commercial laundry and dry

26   cleaning.  Prior to the life crime, the prisoner

27   **MIGUEL AMARO C-88580   DECISION PAGE 5   2/14/07**

```
 1   lacked a significant criminal history of violent
 2   ... ...
 3   understanding and/or advanced age has reduced
 4   probability of recidivism.  And I refer to the
 5   psychological report of 2006 by Dr. Marek wherein
 6   he indicates that you have been free of 115
 7   violations for many years and your behavior has
 8   improved and your judgment has become clear and
 9   you have matured.  If released to the community
10   his violence potential is considered to be at or
11   the same as the average citizen in the community.
12   All things considered his preincarceration record
13   is not that severe.  With the gains he has made
14   here, he should be able to generalize those gains
15   to the community.  Then I'll go on to refer to
16   the report from Dr. Tout (phonetic) on June 6,
17   2000 wherein he indicated that should this inmate
18   at this time be given a parole or release date,
19   his prognosis for maintaining his present gains
20   in the community is excellent as long as he
21   continues to abstain from substance use ...
22   then finally, I will read into the ... ...
23   report from Dr. ... ... he indicated that if
24   released to the community his violence potential
25   is estimated to be no higher than the average
26   citizen in the community.  I have also found that
27   MIGUEL AMARO C-88580  DECISION PAGE 6  2/14/07
```

61

1  the prisoner has realistic parole plans which

2  he made reasonable [illegible] support [illegible]

3  Amaro indicated that he would have a job at

4  Gold's Gym and has other job opportunities lined

5  up, has maintained close family ties while in

6  prison via letters and/or visits and Mr. Amaro

7  has provided various letters from various family

8  members indicating his close family ties, has

9  maintained positive institutional behavior which

10  indicates significant improvement in self

11  control, shows signs of remorse.  Mr. Amaro has

12  indicated that he understands the nature and

13  magnitude of the offense and accepts

14  responsibility for the criminal behavior and has

15  a desire to change towards good citizenship.  In

16  reading the psychological report from Dr. Marek

17  as well as the Board report from CC1 Arnold, it

18  was indicated that you did express remorse for

19  the crime.  I must preface all of this by saying

20  that this decision will be reviewed by an

21  en-banc Panel and then [illegible] they will make

22  their decision and then it will be [illegible] reviewed,

23  reviewed by the governor's office.  So just

24  because, you know I do find you to be suitable

25  doesn't mean that, you know, it stops here.

26        **INMATE AMARO:**  I understand.

27  **MIGUEL AMARO** C-88530  **DECISION PAGE** 7  2/14/07

1        **DEPUTY COMMISSIONER MELVIN:**  & I want :.
2   .... ....
3  the decision back in 2003.  And then i also need
4  to preface this.  I have attempted to take ... .
5  your time and that of course must be checked by,
6  you know, the higher ups in Sacramento.  But
7  essentially the base life offense of which the
8  prisoner has been convicted is second-degree
9  murder ad that occurred on or about 12/5/1982 and
10  the base term of the confinement   the base ...
11  offense of which the prisoner has been convicted
12  is murder second. Penal Code Section 187 which .
13  stated.  The offense occurred on December 5, 1982
14  and the term is derived from the matrix located
15  in CTR Title 15 at Section 2403(c)   This membe:
16  of the Panel finds that category 3(b) is
17  appropriate and that there was no prior
18  relationship or very little relation with the
19  victim and that death was almost immediate.   I
20  did decide to aggravate the term and aggravate ..
21  the term it was because during the commissi.
22  the crime you did have the fear apprehen..
23  cease but instead continued   the manner in wh...
24  the crime was committed created a potential for
25  serous injury to persons other than the victims
26  of the crime which would be the young man that
27  **MIGUEL AMARO C-88580  DECISION PAGE 8   2/14/07**

1  ran away.  The murder was committed to prevent

2  

3  victims for which the term is not being enhanced

4  under Section 2____.  You also had two other with

5  sentences imposed by the court.  Other than the

6  murder second and those were for two counts of

7  kidnapping and for that reason, I'm adding a

8  total of 84 months to the base term and my

9  calculation was that because of a weapon was used

10  an additional year should be added to that and my

11  total was 324 months.  I subtracted a total of 75

12  months for post-conviction credits and my total

13  was 249 months total period of confinement.  In

14  addition, I would add special conditions of

15  parole and they would be not to use alcohol,

16  excuse me, not to use or possess alcoholic

17  beverages, submit to anti-narcotic testing,

18  submit to alcohol testing and continue to

19  participate in programs such as AA or NA.  And

20  that would conclude my decision for your hearing.

21            **INMATE AMARO**   Thank you.

22            **PRESIDING COMMISSIONER KUBOCHI**

23  Mr. Norton.

24            **ATTORNEY NORTON**  Yes.

25            **PRESIDING COMMISSIONER KUBOCHI**  I'm not

26  going to give your client any paperwork on the

27  **MIGUEL AMARO C-88580   DECISION PAGE 9   2/14/0**

1   denial of parole since it's a split vote.  Yet,

2   it's not right to your disposition.

3         **ATTORNEY NORTON:**  Right.

4         **PRESIDING COMMISSIONER KUBOCHI:**  It is that

5   a split vote.

6         **ATTORNEY NORTON:**  That's fine.

7         **PRESIDING COMMISSIONER KUBOCHI:**  You'll of

8   course be entitled to receive a copy of the

9   transcript of the decision.

10        **ATTORNEY NORTON:**  Absolutely, thank you.

11        **PRESIDING COMMISSIONER KUBOCHI:**  All

12  right.  I'll be right out.

13        **DEPUTY COMMISSIONER MELVIN:**  Will that

14  conclude the hearing?

15        **PRESIDING COMMISSIONER KUBOCHI:**  Yes.

16        **DEPUTY COMMISSIONER MELVIN:**  Okay.

17                **A D J O U R N M E N T**

18                    --o0o--

19

20

21

22

23  HELD OVER FOR SPLIT DECISION REVIEW

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  MIGUEL AMARO C-88580    DECISION PAGE 10   2/14/07

PENDING REVIEW AND APPROVAL

98

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, JO ANNE JACKSON, a duly designated
transcriber, NORTHERN CALIFORNIA COURT
REKUBOCHIS, do hereby declare and certify under
penalty of perjury that I have transcribed one
audio recording which covers a total of pages
numbered 1 - 97, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF MIGUEL
AMARO, CDC NO. C-88580 ON FEBRUARY 14, 2007; and
that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned audio recording to the best of my
ability.

I hereby certify that I am a
disinterested party in the above-captioned matter
and have no interest in the outcome of the
hearing.

Dated February 24, 2007, at San Jose,
California.

*[signature]*

———————————————————————————
JO ANNE JACKSON, TRANSCRIBER

**NORTHERN CALIFORNIA COURT RPTRS**

E X H I B I T   2

**Board of Parole Hearings**                                    State of California

## MISCELLANEOUS DECISION

---
### FACTS
---

During the March 20, 2007 Executive Meeting of the Board of Parole Hearings, the
Board, sitting en banc, considered the split decision of the February 14, 2007 subsequent
parole consideration hearing panel for Miguel Amaro, C-88580. By unanimous vote of
the full Board, the prisoner was found unsuitable for parole and parole consideration was
denied for one year.

---
### DECISION(S)
---

By unanimous vote of the full Board, the proposed decision is unsuitable for parole and
parole consideration is denied for one year

| STAFF (Print) | TITLE | DATE |
|---|---|---|
| JOHN F. MONDAY | Executive Officer | 3/21/07 |

| NAME | NUMBER | INSTITUTION |
|---|---|---|
| **AMARO, Miguel** | **C-88580** | **CTF** |

E X H I B I T   3

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
REVISED AUGUST 2006
PAROLE CONSIDERATION HEARING
SEPTEMBER 2006 LIFE TERM INMATE CALENDAR

CORRECTIONAL TRAINING FACILITY SOLEDAD
August 6, 2006

This is the 14th psychological evaluation for the Board of Parole Hearings on inmate Miguel Amaro, CDC# C-88580. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

Amaro is a 53-year-old, separated, Mexican-American male. His birth date is December 1, 1952. He denied any religious affiliation. He presented with no unusual personality characteristics and denied the use of nicknames or aliases.

## II. DEVELOPMENTAL HISTORY:

He is one of six children and was reared by his parents. When he was an infant, he was hospitalized for a year with a deformed toe. However, there were numerous medical complications that resulted in him contracting pneumonia, as well as other serious medical conditions that kept him in the hospital. Other medical conditions also compounded his course of treatment. Amaro reported that all speech, language and motor development occurred normally. He denied any history of cruelty to animals, arson, seizure, enuresis or sexual abuse, either as a perpetrator or a victim. His father physically abused him, however.

## III. EDUCATION:

Amaro completed the eighth grade and completed his GED in 1988. He is close to having an AA degree. He denies being involved in any special education or learning disability program. However, he reports that the a hearing impairment in both ears, but his ability to learn has been unaffected. While incarcerated, he notes reports have generally been excellent.

## IV. FAMILY HISTORY:

His father was an alcoholic and committed suicide in 1975. He reports having a close relationship with his mother and siblings, some of whom live in the local area.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Amaro says he is heterosexual, no denies any history of high risk sexual or high risk aggressive.

## VI. MARITAL HISTORY:

Amaro is currently separated from his wife. He has no children from this marriage. However, he has a daughter from a previous long-term relationship and also assisted in rearing her two children, both of whom are now adults. He continues to have a close relationship with his children and this is a motivating factor for him to have a successful parole.

## VII. MILITARY HISTORY:

Amaro was briefly in the U.S. Army and received an honorable discharge for medical conditions related to his toe, which was noticed four months after enlistment.

## VIII. EMPLOYMENT/INCOME HISTORY:

Prior to his incarceration, he was a welder. He has maintained this certification and currently works for PIA in Maintenance. His work reports are usually "above average." Since his incarceration, he has received vocational training in dry cleaning/laundry and as a forklift driver. He believes his skills and licenses are quite marketable and he anticipates being able to easily find work. In 2004, he received a laudatory chrono for completing the Inmate Employability Program. He has been disciplinary free since his last report.

## IX. SUBSTANCE AND ABUSE HISTORY:

He has an extensive history of alcohol and illegal drug abuse. He was under the influence at the time of the commitment offense and believes that alcohol had a major impact on his behavior. He began drinking alcohol at the age of 13, with drug use following soon thereafter. He believes his incarceration to be a "blessing in disguise." He has not had a drink since his arrest. He has attended AA and NA.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Amaro has had no medical or psychiatric hospitalizations and denies any head injuries, suicidal ideation, seizure, neurological conditions or other problems. He may have a slow circulating loss.

## XI. PLANS IF GRANTED RELEASE:

If paroled, he plans to live in the San Jose area with his mother. He says he has a guaranteed job in Hollister at a Gold mine. His long-term goal is to work in auto repair.

[illegible text]
appear [illegible]

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

[illegible] exhibited no psychotic or depressive symptomatology [illegible] oriented and alert. He had good insight and judgment, especially as they relate to his crime. His intellectual functioning was estimated to be in the average range. His concentration and attention span were good. He should receive drug abuse treatment. His sister has contacted several alcohol abuse programs that he can attend when he is released.

## CURRENT DIAGNOSTIC IMPRESSIONS:

| AXIS I | Polysubstance Dependence, in institutional remission. |
| AXIS II | None |
| AXIS III | Hearing Problems |
| AXIS IV | Incarceration |
| AXIS V | GAF 80 |

Should he be paroled, it is likely he will be able to maintain the gains and improvements he has made.

## XIII. REVIEW OF LIFE CRIME:

His description of the commitment offense was similar to that found in the central file. He had two opportunities to leave but stayed, due to being intoxicated and being told at gunpoint to follow orders. He expresses a great deal of remorse and regret about being involved in this crime. This appears to be genuine. It appears he has matured and has gained insight into himself.

## XIV. ASSESSMENT OF DANGEROUSNESS:

As compared to the other Level II inmates, his violence potential is regarded as low. It has been many years since he has received a 115 and his behavior is improved as has apparently, his judgment and maturity. If released to the community, his violence potential is considered to be about the same as the average citizen in the community. All things considered, his pre-incarceration record is not that severe. With the gains he has made here, he should be able to generalize these gains to the community. Signigicant risk factors and precursors to violence for him would be a return to doing alcohol use and return to an irresponsible lifestyle. He says, however, that he has changed and will never do that again. [illegible] have any alcohol [illegible]

## XV. CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Amado is competent and responsible for his behavior. He has the capacity to abide by institutional rules and has generally done so during his incarceration. He does not ha[illegible]

mental health disorder that would necessitate treatment, supervision, and continuation
on parole. If paroled, he should have mandatory drug/alcohol testing, and mandatory
attendance at a drug treatment program. Parole decisions should be based on that and
factor.

W.K. Marek, Ph.D
Psychologist
Correctional Training Facility-Soledad

B. Zika, Ph.D
Senior Psychologist
Correctional Training Facility-Soledad

E X H I B I T   4

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 2, 2007 | | |
|---|---|---|---|
| Honorable | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

_(Parties and Counsel checked if present)_

BH 004704

In re:

MIGUEL AMARO,                                  Counsel for Petitioner:

Petitioner,

On Habeas Corpus                           Counsel for Respondent:

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on May 11, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that the Petitioner presents an unreasonable risk of danger to society and is unsuitable for parole. Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal 4th 616, 667

The Petitioner was received in the Department of Corrections on July 3, 1984 after a conviction for second degree murder. There were additional counts for kidnapping. The term was fifteen years to life in prison. His minimum parole eligibility date was December 5, 1992

The record reflects that on December 5, 1982, the Petitioner, David and Robert Almarez, and Jeff Sagmeister were in an apartment. Three other persons were also there, including James Tokumoto, Eric Collier and Russell Walker. A fight developed between David Almarez and James Tokumoto, and Mr. Tokumoto was struck several times in the head with a gun. Subsequently, the fight continued and Robert Almarez shot and killed Mr. Tokumoto. At gunpoint, Daniel Almarez taped the mouths and hands of Mr. Collier and Mr. Walker, and the Petitioner assisted in taping up Mr. Collier. The Petitioner was then directed to get some rope, and he returned with a white bag. The Petitioner was then given keys and told to get the car, which he did. The two victims, with their hands tied, were taken away, and the Petitioner was the driver. At some point, the two victims got out of the car, and Mr. Walker was able to escape. Mr. Walker was able to contact the police, which led to the arrest of Robert Almarez. In the meantime, the Petitioner drove Daniel Almarez and Mr. Collier away to a grassy area. The Petitioner was told to stop the car, which he did. Mr. Collier was then shot by Daniel Almarez, despite objections by the Petitioner

On February 14, 2007, the Board reached a split decision as to whether the Petitioner was suitable for parole at the parole consideration hearing. On March 20, 2007 the Board, sitting en banc, considered the split decision and by unanimous vote of the full Board found the Petitioner to be unsuitable for parole. It denied parole for one year.

The Board determined that that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he is released. This decision was based its decision primarily on the commitment offense and on the Petitioner's previous criminal history

1

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

DEPT 100

| Date: | OCTOBER 2, 2007 | | |
|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

Parties and Counsel checked if present

BH 004704
In re.
MIGUEL AMARO,
Petitioner.

Counsel for Petitioner

Counsel for Respondent

On Habeas Corpus

The Court finds that there is some evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The kidnapping and subsequent murder of Mr. Collier was essentially an execution of the victim because he had been present when the killing of Mr. Takumoto occurred. The Petitioner participated in nearly every facet of the crime except for the killing itself. He had numerous opportunities to flee and to call the police and did not do so. Furthermore, the motive for the crime was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). The committing offenses were precipitated by an argument and the Petitioner was not even directly involved in the dispute.

The Court also finds that there is some evidence to support the Board's finding that the Petitioner was previously convicted of assault for hitting a police officer in the face with a brick. Cal. Code Regs., tit. 15, §2402, subd. (c)(2).

In addition, it noted that the District Attorney's Office had opposed the Petitioner's release. While this is also not a factor on which the Board may rely to deny parole, such opposition may be properly considered Penal Code § 3402.

The Board also noted several positive gains that the Petitioner has achieved while incarcerated. However, it concluded that despite these gains, the Petitioner posed an unreasonable threat to public safety at the time of its hearing. Penal Code § 3041(b). As indicated in *Rosenkrantz, supra,* 29 Cal.4th 616, 677, it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole outweighs evidence demonstrating suitability for parole, as long as there is some evidence to support the finding of unsuitability. See also, *In re Jacobson,* (Second Appellate District Court of Appeal, August 28, 2007), (2007) -- Cal. App. 4th _ and *In re Hyde* (Second Appellate District Court of Appeal, August 7, 2007) (2007) Cal. App. 4th --.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties.

2

Minutes Entered
10-02-07
County Clerk

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | OCTOBER 2, 2007 | | |
|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004704

In re.

MIGUEL AMARO,

    Petitioner.

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Miguel Amaro
C-88580
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

State of California - Department of Justice
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS

Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012

PLAINTIFF/PETITIONER

MIGUEL AMARO

Reserved for Clerk's File Stamp

Joseph M. Pulido

CASE NUMBER

## CLERK'S CERTIFICATE OF MAILING
CCP. § 1013(a)
Cal. Rules of Court, rule 2(a)(1)

BH004704

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time
☐ Order to Show Cause
☐ Order for Informal Response
☐ Order for Supplemental Pleading

☒ Order re: Petition for Writ of Habeas Corpus
☐ Order          Petition
☐ Order re:
☐ Copy of Petition for Writ of Habeas Corpus /Suitability
    Hearing Transcript for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with first-class, prepaid postage, and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

October 12, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
              Joseph M. Pulido

Miguel Amaro
C-88580
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

State of California - Department of Justice
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

EXHIBIT 5

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re | )  B 203764 |
| | ) |
| MIGUEL AMARO, | )  (Super. Ct. No. 903202, BH004704) |
| | )  (Peter Espinoza, Judge) |
| on Habeas Corpus. | ) |
| | )        ORDER |
| | ) |
| | ) |

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied for failure to state sufficient facts demonstrating entitlement to the relief requested.  There is "some evidence" to support the findings of the Board of Parole Hearings.  (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.)

* EPSTEIN, P.J.            WILLHITE, J.            SUZUKAWA, J.

E X H I B I T   6

Court of Appeal, Second Appellate District, Div. 4 - No. B203764
S161329

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re MIGUEL AMARO on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.
Moreno, J., is of the opinion the petition should be granted.

SUPREME COURT
FILED

APR 23 2008

Frederick K. Ohlrich Clerk

_____
Deputy

Werdegar

Acting Chief Justice

MIGUEL AMARO, C-885 80
CTF-EAST DORM (ED-172L)
PO Box 689
SolEDAD. CA 93960.

*LEGAL MAIL*

*PRIORITY MAIL*

RECEIVED
MAY 6 2008
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT of CALIFORNIA
450 GolDEN GATE AVE.
SAN FRANCISCO, CA 94

