1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   MIGUEL AMARO,                            No. C-08-2338 TEH (PR)

12              Petitioner,

13        v.                                  ORDER GRANTING PETITION FOR
                                              WRIT OF HABEAS CORPUS
14   BEN CURRY, Warden,

15              Respondent.

16   _____/

17

18            Pro se Petitioner Miguel Amaro, a state prisoner

19   incarcerated at the Correctional Training Facility ("CTF") in

20   Soledad, California, seeks a writ of habeas corpus under 28 U.S.C. §

21   2254 challenging the California Board of Parole Hearings' ("BPH")

22   March 20, 2007 en banc summary decision denying him parole.  Doc.

23   #1; see Doc. #4-2 at 72.  Petitioner's parole suitability

24   determination went en banc after a February 14, 2007 split decision,

25   with one commissioner finding Petitioner unsuitable for parole and

26   another finding him suitable.  See Doc. #1-1 at 39-48.  This was the

27   second time Petitioner received a split decision regarding his

28   parole suitability; the first was in 2004.  Doc. #1.

On June 27, 1984, Petitioner was sentenced to fifteen-years-to-life in state prison following his convictions of second degree felony-murder arising from the death of Eric Collier and of kidnapping Collier's two friends.  Doc. #4-1 at 46–47.  Petitioner's life term began on or around July 3, 1984; his minimum eligible parole date was December 15, 1992.  Id. at 46.  At the time of his 2007 parole denial, Petitioner had served twenty-three years in prison for his commitment offense, fifteen years past his minimum eligible parole date.[1]

The state superior court determined that BPH's decision denying Petitioner parole was supported by "some evidence."  Doc. #4-5 at 2.  The court explained that BPH's decision "was based . . . primarily on the commitment offense and on the Petitioner's previous criminal history."  Id.  The state appellate court agreed that there was "some evidence" to support BPH's decision.  Doc. #4-7 at 2.  The California Supreme Court summarily denied Petitioner's request for review, although Justice Moreno would have granted Petitioner's request.  Doc. #4-9 at 2.  This federal Petition for a Writ of Habeas Corpus followed.  Doc. #1.

For the reasons set forth below, the Court finds that at the time of Petitioner's 2007 parole suitability hearing, there was no evidence to support BPH's decision that he currently would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  The Petition will be granted.

---

[1]   To date, Petitioner has been in prison for his commitment offense for almost twenty-six years.

2

I

At Petitioner's February 14, 2007 parole suitability hearing, BPH read two factual summaries of Petitioner's commitment offense.  Doc. #4-1 at 61–67.  The first was submitted by a correctional counselor at Petitioner's 2003 hearing.  Id. at 61.  The second was Petitioner's version.  Id. at 64.  Each is set forth below.

> On December 5, 1982 at approximately 9:35 p.m., victim Eric Collier along with Russell Walker and James Tokumoto were visiting with Daniel Almarez, Jeff Sagmeister and [Petitioner] in an apartment located at 14724 Chadron Avenue in Lennos.  Tokumoto and Daniel Almarez were in the kitchen talking when the fight started.  Daniel Almarez produced a gun [with] which he struck Tokumoto several times in the head.  Sagmeister saw the gun in Daniel's hand and took it away.  The fight resumed and Daniel Almarez called to Robert Almarez for help.  Robert shot and killed James Tokumoto.  Daniel told Sagmeister to close the drapes and clean up the blood.  At gunpoint Daniel then taped the mouths and hands of the victims Russell Walker and [Eric] Collier and took their wallets.  [Petitioner] assisted in taping up Collier.  Daniel told [Petitioner] to get some rope.  [Petitioner] left and returned with a white bag.  Daniel gave [Petitioner] some keys and told him to get the car.  The two victims Walker and Collier with their hands tied [were] taken to a (inaudible) by Daniel and Robert Almarez.  [Petitioner] was the driver of the vehicle.  [Petitioner] eventually stopped the car on Marine Avenue in Manhattan Beach.  Robert Almarez, the victims Walker and Collier got out of the vehicle.  Walker was able to free his hand and escaped.  Daniel threw Collier back into the car and told Robert to go after Walker.  While running from his captors, Walker could hear two gunshots.  Walker was able to hide and then at one of the residences in the area call the police.  The police arrived, observed Robert Almarez, recovered the gun and took Almarez into custody.  Meanwhile, Daniel told [Petitioner] to go look for Robert and he drove down two

3

streets.  Daniel told [Petitioner] to drive out
of the area and eventually had him stop the car.
Daniel took Collier out to a grassy area.
[Petitioner] told Daniel to let Collier go but
after hesitating, Daniel said, "Fuck, no,"
grabbed Collier, shot him three times.
[Petitioner] and Daniel Almarez drove the victim
Collier from the area and early the following
morning Collier's body was found in the 1900
block of El Segundo Boulevard.  Collier had been
shot in the head.  [Petitioner] and Daniel
Almarez then returned to the apartment and
carried Tokumoto's body into the station wagon
and dumped it at an area near Gardenia.

[Petitioner's] version.

[Petitioner] stated that he had moved in
with Daniel Almarez for only a few days before
the homicide as he was looking for a place to
stay and had been visiting with a girlfriend
throughout most of the day of the homicide.
Danny asked him to sample some cocaine which he
intended to purchase (inaudible), and he sold
the drug but didn't use it ([Petitioner]
returned to the residence and verified that the
drug was good).  [Petitioner] remained at
Almarez'[s] residence drinking beer and eating
pizza with Danny and his friends when he
received a phone call from James Tokumoto.
Tokumoto was invited to join the group and did
so along with the other victims Russell Walker
and Collier.  Almarez learned from Tokumoto that
Tokumoto was responsible for Almarez'[s]
girlfriend moving out and a shouting match
ensued that developed into a fight.  The
incident proceeded as described in the offense
summary and [Petitioner] indicated that at no
time was he a willing participant in the
subsequent kidnappings and shootings.
[Petitioner] stated that he was threatened by
gunpoint by Daniel Almarez if he did not
cooperate.  [Petitioner] indicated that he
unsuccessfully attempted to convince Almarez to
release Walker and Collier during the course of
the kidnapping.  He was outside the immediate
presence of Almarez only once throughout the
incident and was quite fearful that he himself
might be killed since he was aware that Almarez
was heavily involved in gang activity and could
be extremely violent.  The one time [Petitioner]
was away from the immediate presence of Almarez

4

1
2
3
4
5
6
7
8
9
10
11

> was when he was ordered to go outside and get
> the car. [Petitioner] stated that in hindsight
> he realizes he would have been able to flee.  At
> this point the fear for his own life kept him
> from leaving.  After dropping off Tokumoto's
> body, he was returning with Almarez to the
> residence when he was stopped by a peace officer
> at a road block which was set up.  He was taken
> into custody as a result of having a six pack of
> beer open on the front seat.  Almarez who was
> asleep in the back seat was allowed to remain in
> the vehicle.  [Petitioner] was afraid to discuss
> the matter with anyone and since he had not been
> identified at that point[.]  [H]e was released
> on his own recognizance the following day.  He
> stayed with his girlfriend for several days
> during which he was drinking and using drugs
> heavily.  He assumed that eventually he would be
> arrested in the matter and when this did occur
> he continued to maintain his silence.

12   Doc. #4-1 at 61–67.

13          Following the evidentiary portion of the February 14, 2007

14   hearing, BPH rendered a decision regarding Petitioner's parole

15   suitability, telling Petitioner:

16
17
18
19
20
21
22
23
24
25
26
27

> there is a split of opinion in regard to your
> suitability for parole.  I will read my factors
> and findings . . . having reviewed all the
> information from the public and rel[ying] upon
> the circumstances of your life crime as well as
> your progress and programming in state prison
> [I] find that you are not suitable for parole
> and would pose an unreasonable risk of danger to
> society of a threat to public safety if released
> from prison on the grounds that this offense was
> carried out in an especially cruel and callous
> manner in that one victim, Tokumoto was invited
> over by Daniel Almarez to the residence.  Mr.
> Tokumoto brought over two friends at the house.
> The justification for the killing . . .
> indicates it was a drug transaction gone bad.
> There is other information that Mr. Tokumoto had
> some contact with Mr. Alvarez'[s] girlfriend
> that caused Mr. Alvarez to have ill feeling.
> But considering two people were killed that
> night the motive for the crime was inexplicable
> and very trivial in relationship to the loss of

28                                           5

two lives.  The way that the crimes were carried
out shows a dispassionate, calculated manner in
that it was almost execution style.  Mr.
Tokumoto was shot in the kitchen.  The two other
people Walker and Collier was [sic] found.
Their wallets were taken from them at the house.
They were taken in a car driven by you.  The two
Almarez brothers had handguns at the time.  They
drove to one location near Manhattan Beach where
Mr. Walker was able to escape.  Mr. Collier was
put back in the car and shot three times in the
head.  His body was dumped.  You were the driver
of the car at the time.  After that incident you
went back over to the Almarez residence and
assisted Daniel in taking Tokumoto's body and
dumping him in Gardenia in a grassy area.  The
crimes indicate there were multiple victims
. . . attack[ed] and for these reasons including
the fact that you have an escalating pattern of
criminal conduct starting off with the incident
in 1971 where you were involved in hitting a
peace officer with a brick after a (inaudible).
I find that in each instance your explanation
was to blame other people or blame circumstances
that were totally out of your control and yet
you involved yourself voluntarily with
assaultive behavior and it is more than other
people's fault for the ingestion of alcohol or
drugs that triggers this type of violent
conduct.  In addition, I find that you have not
sufficiently participated in beneficial self-
help.  I praise you for participating in
Alcohol[ics] Anonymous.  I praise you for the
therapy that you have obtained.  However, it's
clear that [the] manner in which the crime was
committed in regard to having these three people
two of which [sic] were killed taken [to] over
three different locations in the Los Angeles
area clearly involved an extended period in
which you had hostile feelings regarding your
participation or uncontrollable feelings
regarding your participation in those crimes.
And you need a little more therapy, a little
more insight in regard to why you have this rage
and how you have an easy answer that simply
taking alcohol or drugs can cause you to have
. . . what I [call] an itchy trigger finger
regarding your response and rage towards others.
The district attorney of Los Angeles County
. . . indicates his opposition [to your release]
. . . as [does] the Los Angeles County Sheriff's
Department.  Further in regard to other factors

6

> . . . you ingest mind altering substances and
> your risk for violence is very high.  Simply
> telling the Board that you will refrain from
> alcohol does not address the underlying issues
> that appear to be your problem, and it is a
> finding that you could benefit from further
> therapy before being released back into society.
> For all of these reasons, I find you not
> suitable for parole at this time.

Doc. #4-2 at 60-63.

The second commissioner, who heard and reviewed the same evidence at the February 14, 2007, hearing found that Petitioner was, in fact, suitable for parole, stating:

> I have reviewed all of the information
> received from the public and relied on the
> following circumstances in concluding that
> [Petitioner] is suitable for parole and would
> not pose an unreasonable risk of danger to
> society or a threat to public safety if released
> from prison.  [Petitioner] has no juvenile
> record of assaulting others, has a stable social
> history as exhibited by reasonably stable
> relationships with others.  In particular, . . .
> you've mentioned that you keep in contact with
> your brothers Joseph and Robert seeing them
> every other year, your sister Maria, seeing her
> twice a month and your sister Theresa, seeing
> her once a year.  In addition you mentioned that
> you keep in contact with your niece, your
> nephew, your daughter, your wife and your
> mother.  While in prison, [you have] enhanced
> [your] ability to function within the law upon
> release through participation in educational
> programs[,] specifically you have received your
> GED back in . . . 1988 and you were close to
> getting your AA degree.  Additionally you have
> provided many [l]audatory chronos indicating
> your participation in [Alcoholics Anonymous],
> [Narcotics Anonymous] and anger management.  In
> addition to that, you've indicated that you did
> receive a certificate in welding, you do have
> your forklift license, and I'm incorporating by
> reference previous transcripts from previous
> hearings wherein it was indicated that you have
> vocational training in commercial laundry and
> dry cleaning.  Prior to the life crime, [you]
> lacked a significant criminal history of violent

crimes.  Because of maturation, growth, great
understanding and/or advanced age, [you have]
reduced [the] probability of recidivism.  And I
refer to the psychological report of 2006 by Dr.
Marek wherein he indicates that you have been
free of [serious rules violations] for many
years and your behavior has improved and your
judgment has become clear and you have matured.
If released to the community [your] violence
potential is considered to be about the same as
the average citizen in the community.  All
things considered [your] pre-incarceration
record is not that severe.  With the gains [you
have] made here, [you] should be able to
generalize those gains to the community.  Then
I'll go on to the report from Dr. Tout
(phonetic) on June 6, 2000 wherein he indicated
that should [you] at this time be given a parole
or release date, [your] prognosis for
maintaining [your] present gains in the
community is excellent as long as [you]
continue[] to abstain from substance use.  And
then finally, I will read into the record a 2000
report from Dr. Koch wherein he indicates that
if released to the community [your] violence
potential is estimated to be no higher than the
average citizen in the community.  I have also
found that the prisoner has realistic parole
plans which include a job offer and/or family
support.  [Petitioner] indicated that he would
have a job at Gold's Gym and has other job
opportunities lined up, has maintained close
family ties while in prison via letters and/or
visits and [Petitioner] has provided various
letters from various family members indicating
his close family ties, has maintained positive
institutional behavior which indicates
significant improvement in self control, shows
signs of remorse.  [Petitioner] has indicated
that he understands the nature and magnitude of
the offense and accepts responsibility for the
criminal behavior and has a desire to change
towards good citizenship.  In reading the
psychological report from Dr. Marek as well as
the Board report from [correctional counselor]
Arnold, it was indicated that you did express
remorse for the crime.

Id. at 63-66.

On March 27, 2007, approximately six weeks after the

February 14, 2007 split decision, BPH had an executive meeting.
Doc. #4-2 at 72.  At that meeting, BPH, sitting en banc, by
unanimous vote but without receiving any additional evidence, found
Petitioner unsuitable for parole.  Id.  Petitioner's parole was
deferred for one year.  Id.

Petitioner challenged BPH's en banc decision denying him
parole by filing a petition for a writ of habeas corpus in state
superior court, which the court denied on October 2, 2007.  Doc. #4-
3 at 2-3.  The court determined BPH's decision denying Petitioner
parole was supported by "some evidence," and explained as follows:

> [BPH's] decision was based . . . primarily on
> the commitment offense and on . . . Petitioner's
> previous criminal history.
>
> The Court finds that there is some evidence
> to support the Board's finding that the
> commitment offense was carried out in a
> dispassionate and calculated manner.  Cal. Code
> Regs., tit. 15, §2402, subd. (c)(1)(B).  The
> kidnapping and subsequent murder of Mr. Collier
> was essentially an execution of the victim
> because he had been present when the killing of
> Mr. Takumoto occurred.  The Petitioner
> participated in nearly every facet of the crime
> except for the killing itself.  He had numerous
> opportunities to flee and call the police and
> did not do so.  Furthermore, the motive for the
> crime was very trivial in relation to the
> offense.  Cal. Code Regs., tit. 15, §2402, subd.
> (c)(1)(E).  The committing offenses were
> precipitated by an argument and the Petitioner
> was not even directly involved in the dispute.
>
> The Court also finds there is some evidence
> to support the Board's finding that the
> Petitioner was previously convicted of assault
> for hitting a police officer in the face with a
> brick.  Cal. Code Regs., tit. 15, §2402, subd.
> (c)(2).
>
> In addition [BPH] noted that the District
> Attorney's Office had opposed the Petitioner's

9

1
2
3
> release.  While this is also not a factor on
> which the Board may rely to deny parole, such
> opposition may be properly considered.  Penal
> Code § 3402.

4 Id.

5
6
7
Petitioner then filed a petition for a writ of habeas corpus in the state appellate court, which that court denied on February 21, 2008, in a decision that read, in its entirety:

8
9
10
11
12
> The petition for writ of habeas corpus has
> been read and considered.
>
> The petition is denied for failure to state
> sufficient facts demonstrating entitlement to
> the relief requested.  There is "some evidence"
> to support the findings of the Board of Parole
> Hearings.  (See In re Dannenberg (2005) 34 Cal.
> 4th 1061, 1071).

13
14
15
16
Doc. #4-7 at 2.  The California Supreme Court summarily denied Petitioner's request for review, although Justice Moreno would have granted Petitioner's request.  Doc. #4-9 at 2.  This federal Petition for a Writ of Habeas Corpus followed.  Doc. #1.

17
18
19
20
21
22
Per order filed on October 9, 2008, this Court found Petitioner's claim that BPH violated his due process rights, when liberally construed, colorable under 28 U.S.C. § 2254, and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Doc. #3.  Respondent has filed an Answer and Petitioner has filed a Traverse.  Doc. ## 4 & 5.

23 //
24 //
25 //
26 //
27
28

II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction."  White v. Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a California state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Under this deferential standard, federal habeas relief will not be granted "simply because [this] [C]ourt concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application

11

of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Williams, 529 U.S. at 412; Clark v. Murphy, 331 F3d 1062, 1069 (9th Cir. 2003).

The state court decision to which 28 U.S.C. § 2254 applies is the "last reasoned decision" of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  Although Ylst primarily involved the issue of procedural default, the "look through" rule announced there has been extended beyond that particular context.  Barker, 423 F.3d at 1092 n.3 (citing Lambert v. Blodgett, 393 F.3d 943, 970 n.17 (9th Cir. 2004) and Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003)).  The federal court also looks to any lower state court decision that was examined, and whose reasoning was adopted, by the highest state court to address the merits of a petitioner's claim, as is the case here.  See Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004).

Where, as here, the state courts cited only state law in their decisions, the federal court must ask whether state law, as explained by the state courts, is "contrary to" clearly established governing federal law.  See, e.g., Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001); Hernandez v. Small, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority).  If the

1   state court, relying on state law, correctly identified the

2   governing federal legal rules, the federal court must ask whether

3   the state court applied them unreasonably to the facts.  <u>See</u>

4   <u>Lockhart</u>, 250 F.3d at 1232.

5

6                               III

7                                A

8           The Fifth and Fourteenth Amendments prohibit the

9   government from depriving a prisoner of life, liberty or property

10  without due process of law.  U.S. Const. Amends. V & XIV.  It is now

11  settled that California's parole scheme, codified in California

12  Penal Code section 3041, vests all "prisoners whose sentences

13  provide for the possibility of parole with a constitutionally

14  protected liberty interest in the receipt of a parole release date,

15  a liberty interest that is protected by the procedural safeguards of

16  the Due Process Clause."  <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th

17  Cir. 2007) (citing <u>Sass v. Calif. Bd. of Prison Terms</u>, 461 F.3d

18  1123, 1128 (9th Cir. 2006)); <u>Biggs v. Terhune</u>, 334 F.3d 910, 914

19  (9th Cir. 2003); <u>McQuillon v. Duncan</u>, 306 F.3d 895, 903 (9th Cir.

20  2002).  It matters not that a parole release date has not been set

21  for the prisoner because "[t]he liberty interest is created, not

22  upon the grant of a parole date, but upon the incarceration of the

23  inmate."  <u>Biggs</u>, 334 F.3d at 915.  Due process accordingly requires

24  that a parole board premise its decision regarding a petitioner's

25  parole suitability on "some evidence in the record" such that the

26  decision is not arbitrary.  <u>Sass</u>, 461 F.3d at 1128-29 (quoting

27

28                              13

Superintendent v. Hill, 472 U.S. 445, 457 (1985)).  The "some evidence" standard is clearly established federal law in the parole context for purposes of § 2254(d).  Id. at 1129.

The Supreme Court set forth the "some evidence" standard in Hill, which concerned the revocation of "good time" credits towards parole resulting from prisoner misconduct.  Hill, 472 U.S. at 455.  The Court rested its holding upon the procedural due process foundation it laid in Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974).  As the Court noted, Wolff required, among other things, that a prisoner receive "a written statement by the fact finder of the evidence relied on and the reasons" for the deprivation of his good time credits.  Hill, 472 U.S. at 454 (citing Wolff, 418 U.S. at 565).  The Court then added to the foundation it laid in Wolff:  "[R]evocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record."  Hill, 472 U.S. at 455 (quoting Wolff, 418 U.S. at 558).

The "some evidence" standard does not permit this Court to "reweigh the evidence."  Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994).  Instead, the inquiry is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  Hill, 472 U.S. at 455-56.  While this test is not stringent, it must at minimum protect a prisoner's "strong interest in assuring that the loss of [parole] is not imposed arbitrarily."  Id. at 454.

14

Due process also requires that the evidence underlying the parole board's decision have some indicium of reliability. <u>Biggs</u>, 334 F.3d at 915; <u>McQuillion</u>, 306 F.3d at 904. Relevant to this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the board. <u>See</u> <u>Pedro v. Oregon Parole Bd.</u>, 825 F.2d 1396, 1399 (9th Cir. 1987). If BPH's determination of parole unsuitability is to satisfy due process, there must be some reliable evidence to support the decision. <u>Rosas v. Nielsen</u>, 428 F.3d 1229, 1232 (9th Cir. 2005).

**B**

When assessing whether a state parole board's suitability determination was supported by "some evidence," the Court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. <u>Irons</u>, 505 F.3d at 850. Under California law, prisoners serving indeterminate life sentences, like Petitioner, become eligible for parole after serving minimum terms of confinement required by statute. <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1069–70 (2005). At that point, California's parole scheme provides that BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Cal. Pen. Code § 3041(b). Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the

15

judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  Cal. Code Regs. tit. xv, § 2402(a).  In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release. See Cal. Code Regs. tit. xv, § 2402(b)-(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Cal. Code Regs. tit. xv, § 2402(c)(1).  The factors to be considered in making that determination include:  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

Under California law, the "core determination" regarding a prisoner's threat to public safety "involves an assessment of an inmate's *current* dangerousness."  See In re Lawrence, 44 Cal. 4th 1181, 1205 (2008) (emphasis in original) (citing In re Rosenkrantz, 29 Cal. 4th 616 (2002) and In re Dannenberg, 34 Cal. 4th 1061

16

1   (2005)).  According to the court:

2             to the extent our decisions in Rosenkrantz and
              Dannenberg have been read to imply that a
3             particularly egregious commitment offense *always*
              will provide the requisite modicum of evidence
4             supporting the Board's or the Governor's
              decision, this assumption is inconsistent with
5             the statutory mandate that the Board and the
              Governor consider all relevant statutory factors
6             when evaluating an inmate's suitability for
              parole, and inconsistent with the inmate's due
7             process liberty interest in parole that we
              recognized in Rosenkrantz.

8

9   Lawrence, 44 Cal. 4th at 1191 (emphasis in original).  The court

10  continued:

11            In some cases, such as this one, in which
              evidence of the inmate's rehabilitation and
12            suitability for parole under the governing
              statutes and regulations is overwhelming, the
13            only evidence related to unsuitability is the
              gravity of the commitment offense, and that
14            offense is both temporally remote and mitigated
              by circumstances indicating the conduct is
15            unlikely to recur, the immutable circumstance
              that the commitment offense involved aggravated
16            conduct does not provide "some evidence"
              *inevitably* supporting the ultimate decision that
17            the inmate remains a threat to public safety.

18  Id. (emphasis in original).

19

20                              C

21       A critical issue in parole denial cases concerns BPH's use

22  of evidence about the crime that led to the conviction.  A trio of

23  Ninth Circuit cases guide the application of the Superintendent v.

24  Hill "some evidence" standard in determining whether a particular

25  prisoner would pose an unreasonable risk of danger to society or a

26  threat to public safety if released from prison, taking into account

27

28                            17

the circumstances of the commitment offense: _Biggs_, 334 F.3d 910,
_Sass_, 461 F.3d 1123 and _Irons_, 505 F.3d 846. The first case, _Biggs_,
explained that the value of the criminal offense fades over time as
a predictor of parole suitability:

> The Parole Board's decision is one of 'equity'
> and requires a careful balancing and assessment
> of the factors considered. . . . A continued
> reliance in the future on an unchanging factor,
> the circumstance of the offense and conduct
> prior to imprisonment, runs contrary to the
> rehabilitative goals espoused by the prison
> system and could result in a due process
> violation.

_Biggs_, 334 F.3d at 916–17. Although the court in _Biggs_ upheld the
initial denial of a parole date based solely on the nature of the
crime and the prisoner's conduct before incarceration, it cautioned
that "[o]ver time . . ., should Biggs continue to demonstrate
exemplary behavior and evidence of rehabilitation, denying him a
parole date simply because of the nature of Biggs' offense and prior
conduct would raise serious questions involving his liberty interest
in parole." _Id._ at 916.

Next came _Sass_, which criticized the court's statements in
_Biggs_ as improper and beyond the scope of the dispute before the
court. _Sass_ determined that the parole board is not precluded from
relying on unchanging factors such as the circumstances of the
commitment offense or the parole applicant's pre-offense behavior in
determining parole suitability. See _Sass_, 461 F.3d at 1129
(commitment offenses in combination with prior offenses provided
some evidence to support denial of parole at subsequent parole
consideration hearing).

18

1    The last of the three cases, <u>Irons</u>, determined that due
2  process was not violated by the use of the commitment offense and
3  pre-offense criminality to deny parole for a prisoner sixteen years
4  into his seventeen-to-life sentence.   <u>Irons</u> emphasized, however,
5  that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court
6  had "held that a parole board's decision to deem a prisoner
7  unsuitable for parole solely on the basis of his commitment offense
8  comports with due process, the decision was made before the inmate
9  had served the minimum number of years required by his sentence."
10  <u>Irons</u>, 505 F.3d at 853.   The court, citing <u>Biggs</u>, then expressed
11  "hope that the Board will come to recognize that in some cases,
12  indefinite detention based solely on an inmate's commitment offense,
13  regardless of the extent of his rehabilitation, will at some point
14  violate due process, given the liberty interest in parole that flows
15  from the relevant California statutes."   <u>Id.</u> at 854.

16
17                                  IV

18    Petitioner seeks federal habeas corpus relief from BPH's
19  March 27, 2007 en banc decision finding him unsuitable for parole
20  and denying him a subsequent hearing for one year on the ground that
21  the decision does not comport with due process.

22    After a careful review of the record, and as explained
23  below, the Court finds that at the time of Petitioner's 2007 parole
24  suitability hearing, there simply was no reliable evidence to
25  suggest that he would pose an unreasonable risk of danger to society
26  or a threat to public safety if released from prison.   <u>See</u> Cal. Code
27

28                                  19

Regs. tit. xv, § 2402(a).  Rather, the Court finds the record was "so devoid of evidence that the findings of [BPH] were without support or otherwise arbitrary."  <u>Hill</u>, 472 U.S. at 457, such that the state courts' determinations that there was "some evidence" in the record to support BPH's decision to deny Petitioner parole were objectively unreasonable applications of <u>Hill</u>.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. at 411; <u>Williams v. Rhoades</u>, 354 F.3d at 1106.

At his February 14, 2007 parole suitability hearing, one BPH commissioner found Petitioner was not suitable for parole and would pose an unreasonable risk to society or threat to public safety if released from prison; a second commissioner, who heard and reviewed the same evidence, reached the opposite conclusion.  Doc. #4-2 at 60-66. The commissioner who found Petitioner unsuitable for parole relied heavily on the circumstances of the commitment offense, describing them in great detail.  Doc. #4-2 at 60-62.  This commissioner also concluded that Petitioner's "risk for violence is very high" and that he had an "itchy trigger finger regarding [his] response with rage and anger towards others."  Id. at 63.

But according to the psychologist who evaluated Petitioner prior to his 2007 hearing, under the heading "ASSESSMENT OF DANGEROUSNESS":

> As compared to the other Level II inmates, [Petitioner's] violence potential is regarded as lower.  It has been many years since he has received a [serious rules violation] and his behavior has improved as has, apparently, his judgment and maturity.  If released to the community, his violence potential is considered to be about the same as the average citizen in

20

> the community.  All things considered, his pre-
> incarceration record is not that severe.  With
> the gains he has made here, he should be able to
> generalize those gains to the community.
> Significant risk factors and precursors to
> violence for him would be a return to
> drug/alcohol use and a return to an
> irresponsible lifestyle.  He says, however, that
> he "has changed and won't ever do that again.
> You can have fun without [drugs and alcohol]."

Doc. #4-2 at 76.  The psychologist concluded his evaluation of

Petitioner by noting:

> [Petitioner] is competent and responsible for
> his behavior.  He has the capacity to abide by
> institutional rules and has generally done so
> during his incarceration.  He does not have a
> mental health disorder that would necessitate
> treatment either during his incarceration or on
> parole.  If paroled, he should have mandatory
> drug/alcohol testing and mandatory attendance at
> a drug treatment program.  Parole decisions
> should be based on custody factors.

Id. at 76-77.

In light of the conclusion reached by a licensed

psychologist, i.e., someone with the educational background and

practical training that qualifies him to make these precise types of

assessments, the Court dismisses the statements of the commissioner

who found Petitioner unsuitable for parole, i.e., that Petitioner

had an "itchy trigger finger regarding [his] response with rage and

anger towards others" and that Petitioner's "risk for violence [was]

very high," Doc. #4-2 at 60-63, as based on sheer speculation,

rather than on reliable evidence, as due process requires.  See

Rosas, 428 F.3d at 1232 (if BPH's determination of parole

unsuitability is to satisfy due process, there must be some reliable

21

1   evidence to support the decision).

2           Indeed, the second commissioner relied heavily on the

3   psychologist's conclusions regarding whether Petitioner would pose

4   an unreasonable risk of danger to society if released from prison,

5   and quoted extensively from that evaluation in explaining his

6   reasons for finding that Petitioner would not.  Doc. #4-2 at 65.

7   Further, during the evidentiary portion of the hearing, this

8   commissioner read the following laudatory chrono into the record:

9           We have a laudatory chrono here dated 9/30/06
            and it's from Dave Rodriguez and he indicates
10          you've been an active participant in [Alcoholics
            Anonymous ("AA") and Narcotics Anonymous ("NA")]
11          at CTF and he says that you've been a
            contributing member of the group since May of
12          [19]88 and you positively participated and
            [have] shown ability to understand and
13          comprehend all aspects of the 12-step programs
            through [your] own self-improvement techniques.
14          [Petitioner] is to be lauded for his continued
            participation and positive contributions to AA
15          and NA at CTF.

16  Doc. #4-2 at 10.  The commissioner than noted that Petitioner had

17  received similar laudatory chronos from Rodriguez regarding his

18  participation in AA and NA on March 31, 2005, April 1, 2005, June

19  30, 2005, October 6, 2005, December 27, 2005, December 30, 2005,

20  March 31, 2006, April 1, 2006, June 30, 2006 and December 29, 2006.

21  Id. at 10-13.

22          Petitioner's attorney then read into the record two

23  laudatory chronos Petitioner had received from CTF staff the day

24  before his hearing.  Doc. #4-2 at 13-14.  The first was from

25  Correctional Officer A. Salazar, who stated:

26          [Petitioner] has been housed in the east dorm
            facility for approximately 11 years now.  The
27

28                                  22

1
2
3
4
5
6
7
8
9

> east dorm is a privileged facility that requires
> inmates to remain disciplinary free, follow
> housing regulations as they pertain to
> security/safety concerns and to program
> productively in a working environment.  As a
> facility second watch dorm officer, I've had the
> opportunity to observe [Petitioner] throughout
> his daily activities during the past seven
> years.  He's always respectful to his peers and
> staff alike by remaining disciplinary free in a
> sensitive environment such as east dorm
> facility[.]   [H]e demonstrates a mature level of
> responsibility, tactfulness and concern for
> himself, staff and inmates who live with him.
> He has earned the respect of many who know him.
> He has definitely earned mine.

10  Doc. #4-2 at 13.  The second was from M. Eucina, Industries Patrol

11  Officer, who stated:

12
13
14
15
16
17
18
19
20
21
22
23
24
25

> During the previous 11 years, [Petitioner]
> has been housed at the central facility east
> dorm.  Having worked as an east dorm patrol
> officer, I have had the opportunity to observe
> the overall demeanor of countless inmates.
> While at work I ha[ve] observed [Petitioner]
> interact positively with both inmate and staff
> alike.  Though living in a prison setting often
> makes inmate/staff (as well as inmate/inmate)
> interactions difficult, [Petitioner] has never
> allowed such difficulties to stop him from
> communicating in a positive fashion with
> everyone.  His overall attitude is one of
> respect and his willingness to . . . "Reach out"
> . . . to others in this manner should be
> commended.  He is conscientious and respectful
> in his dealing with staff and does not have any
> disciplinary problem.  These are attributes
> deserving of recognition.  It is my professional
> opinion that [Petitioner's] willingness to do
> well in this prison community is indicative of
> what is expected of a paroling inmate.  These
> are attributes deserving of recognition.  This
> [chrono] was written as a character reference of
> the person [Petitioner] is today and I believe
> [Petitioner] will continue to maintain his
> positive attitude upon release.

26  Doc. #4-2 at 14-15.  Petitioner's attorney also read into the record

27

28

1  a February 7, 2007 memorandum from Correctional Officer P.K.

2  Sterling, who stated:

3              On November 21, 2005, I wrote and submitted
            a memorandum to [BPH] on behalf of [Petitioner].
4            As I don't want to take up too much of your time
            nor repeat myself unnecessarily I ask that you
5            refer once again to said memorandum which I've
            attached for your convenience.  My reason for
6            submitting the second memorandum is simple yet
            sincere.  I wish to impress upon this Panel my
7            continued belief in [Petitioner] and the fact
            that he would be a productive member of society
8            if given the opportunity.  In closing, I must
            reiterate the fact that I am not in the habit of
9            writing Laudatory chronos/memos on behalf of
            inmates.  Despite the various disappointments
10           and struggles [Petitioner] has had to
            continually face in prison, he continues to
11           demonstrate an ability to overcome such in a
            positive and healthy manner.  As such, I believe
12           [Petitioner] will continue to do so on his
            release.  Thank you for your time.
13

14  Doc. #4-2 at 15–16.

15              Thus, the record before the Court shows that at the time

16  of his 2007 parole suitability hearing, Petitioner had the support

17  not only of one BPH commissioner, but the psychologist who evaluated

18  Petitioner in anticipation of his parole suitability hearing, as

19  well as three CTF staff members, one of whom noted he was "not in

20  the habit of writing Laudatory chronos/memos on behalf of inmates"

21  but did so in Petitioner's case because of his firm belief

22  Petitioner would transition successfully into the community.  Also

23  weighing heavily in favor of a finding of suitability were

24  Petitioner's realistic parole plans, which included a solid offer of

25  employment, a variety of vocational skills he could use, and a

26  support system that awaited Petitioner upon his release, documented

27

28                                    24

by numerous letters from his siblings, who visited Petitioner regularly throughout the duration of his imprisonment.  Doc. #4-2 at 64 & 66.

Finally, with respect to the commitment offense, the Court notes that Petitioner was convicted of second degree felony-murder, due to his limited involvement in the commitment offense – as noted by the state superior court, see Doc. #4-3 at 2-3, in that he was not even present when the first victim, James Tokumoto, was killed by Robert Almarez.  The Court further finds the commitment offense was an isolated aberration in Petitioner's past, "temporally remote" – committed some twenty-five years earlier – and certainly mitigated by various circumstances such as Petitioner's maturity and documented model behavior while in prison, indicating the conduct is unlikely to recur.  See Lawrence, 44 Cal. 4th at 1191.  At the time BPH denied Petitioner a parole date in 2007, he had served twenty-three years on his seven-to-life sentence, fifteen years past his minimum eligible parole date.  Perhaps in some cases the circumstances of a prisoner's commitment offense reasonably may continue to predict his future even in spite of a prisoner's dramatic behavioral improvement while in prison.  But, where, as here, Petitioner's "not that severe" prior criminal history, his strong and wide-spread support from one BPH commissioner, three correctional officers and family and friends, his realistic parole plans that included a firm employment offer, financial support and a place to live, his consistently favorable psychological evaluations and his lack of any recent serious disciplinary violations, his

1   continued imprisonment based on the circumstances of his 1982

2   commitment offense rises to the level of a due process violation the

3   Ninth Circuit envisioned.  See Irons, 505 F.3d at 854 ("in some

4   cases, indefinite detention based solely on an inmate's commitment

5   offense, regardless of the extent of his rehabilitation, will at

6   some point violate due process, given the liberty interest in parole

7   that flows from the relevant California statutes").

8           After careful review of the law and the factual record now

9   before the Court, it is difficult, if not impossible, to reconcile

10  BPH's decision to deny Petitioner parole with the evidence upon

11  which it relied to make that decision.  The Court finds the record

12  was "so devoid of evidence that the findings of [BPH] were without

13  support or otherwise arbitrary."  Hill, 472 U.S. at 457.  The state

14  courts' determinations that BPH's finding that Petitioner was

15  unsuitable for parole and posed an unreasonable danger to society or

16  threat to public safety if released from prison constituted "some

17  evidence" of unsuitability were contrary to, and involved an

18  unreasonable application of, clearly established federal law, and

19  were based on an unreasonable determination of the facts.  See 28

20  U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. at 411; Williams v.

21  Rhoades, 354 F.3d at 1106.  There simply was no reliable evidence to

22  suggest that if released on parole, Petitioner would pose an

23  unreasonable risk of danger to society or a threat to public safety

24  if released from prison.  Cal. Code Regs. tit. xv, § 2402(a).  As a

25  result, Petitioner is entitled to federal habeas relief on his due

26  process claim.

27

28                                 26

V

For the reasons stated above, the Petition for Writ of Habeas Corpus is GRANTED.  Within twenty (20) days of the date of this order, BPH must calculate a term for Petitioner and set an imminent date for his release in accordance with California Penal Code § 3041(a).  <u>See</u> <u>McQuillon v. Duncan</u>, 346 F.3d 1012, 1015 (9th Cir. 2003).  Within ten (10) days of Petitioner's release, Respondent must file a notice with the Court confirming the date on which Petitioner was released.


IT IS SO ORDERED.


DATED    03/29/10

THELTON E. HENDERSON
United States District Judge

G:\PRO-SE\TEH\HC.08\Amaro-08-2338-bph grant.wpd

27